IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 7, 2012 Session

# CLIFTON A. LAKE ET AL. v. THE MEMPHIS LANDSMEN, LLC ET AL.

**Appeal by Permission from the Court of Appeals, Western Section**
**Circuit Court for Shelby County**
**No. CT00609400      John R. McCarroll, Jr., Judge**

**No. W2011-00660-SC-R11-CV - Filed May 3, 2013**

On March 18, 1998, a concrete truck collided with a shuttle bus used to transport passengers between the Memphis International Airport and a nearby rental car facility. A passenger, who suffered a severe brain injury as a result of the collision, and his wife brought suit against the owner of the bus, the manufacturer of the bus, the manufacturer of the bus windows, and the franchisor of the rental car business. They based their claims in negligence and products liability, contending that the bus was unsafe because it was not equipped with passenger seatbelts, because it had side windows made of tempered glass rather than laminated glass, and because it provided perimeter seating instead of forward-facing rows. The trial court granted summary judgment to the window manufacturer and partial summary judgments as to the products liability claims against the bus owner and franchisor, but otherwise denied the defendants' motions for summary judgment, which asserted that the plaintiffs' claims were preempted by federal motor vehicle safety standards. Following trial, the jury found that the plaintiffs had sustained damages in the amount of $8,543,630, but assessed 100% of the fault to the corporate owner of the concrete truck, which had reached a settlement with the plaintiffs prior to trial. On appeal, the plaintiffs contended that they were entitled to a new trial, citing twelve grounds for review. As a threshold issue, however, the defendants continued to argue federal preemption of the claims. The Court of Appeals held that Federal Motor Vehicle Safety Standards 205 and 208, 49 C.F.R. §§ 571.205, .208 (1995), preempted the claims based on the lack of passenger seatbelts and the material used in the window glass, and further ruled that the trial court had erred by failing to grant a directed verdict on the perimeter-seating claim because the evidence was insufficient to establish causation. We granted the plaintiffs permission to appeal and remanded the case to the Court of Appeals for reconsideration in light of the intervening decision by the United States Supreme Court in Williamson v. Mazda Motor of America, Inc., 131 S. Ct. 1131 (2011). On remand, the Court of Appeals reaffirmed its prior judgment, concluding that the ruling in Williamson did not affect its previous analysis. The plaintiffs were again granted permission to appeal. Because the seatbelt and window-glass claims are not preempted by

federal law and the evidence sufficiently demonstrates causation in fact as to the perimeter-seating claim, the judgment is reversed and the cause is remanded to the Court of Appeals for consideration of the plaintiffs' claims of error during the course of the trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Court of Appeals**

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Gary K. Smith and C. Philip M. Campbell, Memphis, Tennessee, for the appellants, Clifton A. Lake and Charleen J. Lake.

Kenneth R. Rudstrom, Memphis, Tennessee, and James E. Singer, Atlanta, Georgia, for the appellee, The Memphis Landsmen, LLC.

Molly A. Glover, Aaron Robert Parker, Steve N. Snyder, and Eric J. Llewellyn, Memphis, Tennessee, for the appellee, Metrotrans Corporation.

James Branson Summers, Heather Webb Fletcher, and Kirk Caraway, Memphis, Tennessee, for the appellee, Budget Rent A Car Systems, Inc.

**OPINION**

**I. Facts and Procedural History**

On March 18, 1998, a 60,000-pound concrete truck owned by Horn Lake Redi-mix ("Horn Lake") collided with a shuttle bus at an intersection near the Memphis International Airport, spinning the back of the bus into a light pole. Clifton Lake ("Lake"), an attorney from Chicago, had arrived at the airport that morning and was one of two passengers on the shuttle bus at the time of the accident. As a result of the collision, he was thrown through one of the side windows of the bus and suffered a traumatic brain injury. The owner of the bus, The Memphis Landsmen, LLC ("Landsmen"), operated a rental car business through a franchise with Budget Rent A Car Systems, Inc. ("Budget"), and used the bus to shuttle passengers between its rental car facility and the airport. The bus was manufactured in October of 1995 by Metrotrans Corporation ("Metrotrans"). Its windows were manufactured by Hehr International, Inc. ("Hehr").

In 1999, Lake and his wife, Charleen Lake (collectively, the "Plaintiffs"), filed a complaint in federal court against Horn Lake, Landsmen, Metrotrans, and Hehr, seeking damages on theories of negligence and strict liability. When Metrotrans, in response to the

complaint, alleged comparative fault on the part of Budget, the Plaintiffs amended their complaint to add Budget as a defendant, arguing that Landsmen had acted as the agent of Budget. The joinder of Budget divested the federal court of subject matter jurisdiction and led to the dismissal of the complaint without prejudice.[1] After settling their claim with Horn Lake, the Plaintiffs commenced this case on October 18, 2000, by filing a complaint against Metrotrans, Landsmen, Budget (collectively, the "Defendants"), and Hehr. The trial court granted summary judgment in favor of Hehr, dismissing Hehr from the litigation.

In their complaint, as amended, the Plaintiffs asserted a cause of action for common law negligence against each of the Defendants, contending that the driver of the bus failed "to exercise ordinary and reasonable care" in his operation of the bus, and claiming that Landsmen, as the driver's employer, was vicariously liable. The Plaintiffs alleged that Metrotrans was negligent in the manufacture and sale of a bus without passenger seatbelts, and that Landsmen was negligent for purchasing and using such a bus "when seatbelts were offered as an option . . . and could have been installed in the vehicle for a relatively small cost." The Plaintiffs claimed negligence on the part of Budget based on a franchise theory of agency, asserting that "Landsmen acted . . . as either the actual or apparent agent of [Budget]" in purchasing and using the bus. The Plaintiffs also claimed that Budget acted negligently in creating "corporate specifications" for franchisees that did not include passenger seatbelts for shuttle buses.

The Plaintiffs also asserted a cause of action for strict liability against each of the Defendants under the Tennessee Products Liability Act of 1978 ("Products Liability Act"), Tenn. Code Ann. §§ 29-28-101 to -108 (2000 & Supp. 2006), which provides, in pertinent part, that the "manufacturer or seller of a product" may be liable for injuries caused by the product if it is "determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller."[2] Id. § 29-28-105(a). The Plaintiffs

---

[1] Federal subject matter jurisdiction in the case had been premised on the diverse citizenship of the parties. Because Budget, like the Plaintiffs, qualified as a citizen of Illinois, the addition of Budget as a defendant precluded the continued exercise of diversity jurisdiction. See 28 U.S.C. § 1332 (2006).

[2] The Products Liability Act defines the term "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Id. § 29-28-102(2). The term "unreasonably dangerous" means that

a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming

(continued...)

maintained that the bus was in a defective condition and was unreasonably dangerous because it lacked passenger seatbelts, had side windows made of tempered glass rather than laminated glass, and used a perimeter seating arrangement instead of rows with forward-facing seats. The Plaintiffs sought recovery under the Products Liability Act, claiming that Metrotrans, in conjunction with Landsmen and in reliance on the corporate specifications established by Budget, had developed an unsafe design.

Each of the Defendants moved for summary judgment, arguing, among other things, that Federal Motor Vehicle Safety Standard ("FMVSS") 205 preempted the claim based on the material used in the window glass and that FMVSS 208 preempted the claim based on the lack of passenger seatbelts. See 49 C.F.R. §§ 571.205, .208 (1995). The trial court granted partial summary judgment as to the products liability claims against Landsmen and Budget,[3] but otherwise denied the motions by each of the Defendants, including the assertions of preemption. In August of 2008, the case proceeded to trial, which extended over a three-week period.

At trial, Wayne McCracken, a mechanical engineer specializing in motor vehicle accident reconstruction, testified that the bus had a Gross Vehicle Weight Rating ("GVWR") of 11,500 pounds, whereas the concrete truck weighed approximately 60,000 pounds. According to McCracken, a witness for the Plaintiffs, the bus was traveling through an intersection at approximately twenty-eight miles per hour when the driver of the concrete truck, which was traveling in the opposite direction at approximately ten miles per hour, failed to yield as he attempted to make a left turn, thereby causing the collision. McCracken testified that the concrete truck hit the driver side of the bus near the rear wheels, causing the bus to spin in a counterclockwise direction until the passenger side of the rear of the bus struck a light pole. McCracken further indicated that he understood from the information made available to him that Lake had been seated in one of the inward-facing seats on the driver side of the passenger compartment.[4] McCracken explained that a person sitting in that

_____

[2](...continued)
that the manufacturer or seller knew of its dangerous condition.

Id. § 29-28-102(8).

[3] The trial court ruled that the Plaintiffs could not recover damages from Landsmen or Budget on a products liability theory because they had not manufactured or sold the bus or any of its components.

[4] During his testimony, McCracken stated that the information he reviewed included photographs of the accident scene, deposition testimony, and witness statements, including a statement by the other passenger on the bus. While the other passenger did not testify, he provided a statement indicating that Lake had been seated across from him at the time of the accident. The statement, while reviewed by McCracken,
(continued...)

location would have taken on the velocity of the bus as it spun and would be forced towards the windows on the passenger side upon impact with the light pole.

Dr. Brian Frist, a medical examiner with expertise in auto-collision occupant kinematics, which involves the study of occupant motion during a crash, testified that as a result of the accident, Lake suffered a traumatic brain injury that left him with impaired cognitive functioning. According to Dr. Frist, the injury likely occurred when Lake was ejected from the bus and his head struck a cement divider on the street. While conceding that it was "possible, though not probable," that Lake's brain injury resulted from an impact with the interior of the bus prior to his ejection or from an impact with the window glass during his ejection, Dr. Frist opined that Lake would not have sustained a traumatic brain injury had he not been thrown from the bus.

Dr. Carl Evan Nash, a physicist specializing in automotive safety, testified that the bus provided inadequate safeguards against occupant ejection in three ways: first, the bus had a seatbelt for the driver but was not equipped with passenger seatbelts; second, the bus had perimeter seating, meaning that it had seats along the sides and rear of the bus that faced toward the center; and, third, the bus contained tempered glass rather than laminated glass in the side windows. Dr. Nash explained that a perimeter seating configuration was problematic because, unlike a forward-facing configuration, it did not offer "compartmentalization," which Dr. Nash defined as the construction of seats in a manner designed to contain occupants in the event of an accident. He explained the difference between tempered and laminated glass as follows:

> [T]empered glass has been subjected to a heat treatment to make it extremely resistant to breaking. However, there's a lot of stress that's built up in the glass in that process, so that when it breaks, it totally shatters into very small pieces such that the glass itself is not likely to harm a person, but it no longer forms a barrier in the window opening.
>
> . . . .
>
> Laminated glass by contrast has two layers of glass separated by a very strong plastic layer, and it's all glued together, and when laminated glass breaks, the plastic [layer] in the center continues to act as a barrier through which ejection becomes difficult.

---

[4](...continued)
was not disclosed to the jury.

Dr. Nash testified that because of these characteristics, the bus offered inadequate protection from occupant ejection—a major issue given that an occupant who is ejected during an accident is approximately four times likelier to suffer severe or fatal injuries than an occupant who is contained inside the vehicle. Dr. Nash concluded that Lake would not have been ejected if he had been wearing a seatbelt and that he "almost certainly" would not have been ejected if the bus had been equipped with side windows made of laminated glass. Dr. Nash acknowledged that all components of the bus—including its seatbelts, window glass, and seating configuration—were in compliance with the applicable federal regulations, and he conceded that a 60,000-pound concrete truck traveling at around ten to twelve miles per hour would generate roughly twenty times as much force as a 3000-pound automobile going the same speed.

Several witnesses testified as to Lake's physical, emotional, and economic injuries, as well as to his wife's loss of consortium and companionship. The Plaintiffs' two adult children offered testimony, as did two of Lake's former colleagues and several medical and economic experts. Although Lake had no recollection of the accident, he was able to testify as to the nature of his injuries and their effects.

Landsmen called a single witness, Bill Shultz, who had worked as the General Manager for Landsmen at the time the company purchased the bus in 1995 and at the time of the accident in 1998. Shultz, who was responsible for purchasing the bus and had knowledge of the general practices in the rental car industry, testified that at the time Landsmen purchased the bus, all rental car businesses in the country used shuttle buses that had perimeter seating without passenger seatbelts. Shultz further testified that he was unaware of any previous accident involving a rental car shuttle bus as serious as the one in this case. According to Shultz, the corporate office for Budget had recommended the 1995 model manufactured by Metrotrans because it was believed to be the best on the market. On cross-examination, Shultz explained that while Budget recommended the 1995 Metrotrans model, Budget exerted no control over what type of bus Landsmen purchased and had no authority to override any purchasing decision by Landsmen.

Terri Hobbs, as Executive Vice President at Metrotrans, was responsible for the sale of the bus to Landsmen. She testified that representatives from Budget had collaborated with Metrotrans in developing the specifications that Budget used in making recommendations to its franchisees regarding which shuttle buses to use. According to Hobbs, Landsmen purchased the bus in question based upon Budget's recommended specifications. She testified that she had provided Landsmen with advertising material indicating that seatbelts were offered as an option on the 1995 model purchased by Landsmen; she pointed out, however, that passenger seatbelts were not included in Budget's specifications and were not

standard for shuttle buses in the rental car industry. Hobbs likewise testified that a majority of the buses sold to rental car businesses included a perimeter seating arrangement.

At the close of the proof, each of the Defendants renewed their motions for a directed verdict, which had previously been denied when the Plaintiffs rested their case. The trial court granted Budget's motion on the issue of agency and also granted a directed verdict on the issue of the bus driver's negligence, ruling that the evidence was insufficient as a matter of law to demonstrate that the bus driver either caused or contributed to Lake's injuries. The trial court denied the remaining motions for a directed verdict.

After finding that the Plaintiffs had suffered damages in the amount of $8,543,630, the jury assessed 100% of the fault to Horn Lake and concluded that none of the Defendants were at fault for the injuries to the Plaintiffs.

On appeal to the Court of Appeals, the Plaintiffs presented twelve issues. <u>Lake v. Memphis Landsmen, L.L.C.</u>, No. W2009-00526-COA-R3-CV, 2010 WL 891867, at *3 (Tenn. Ct. App. Mar. 15, 2010) ("<u>Lake I</u>").[5]   In response, Budget raised a single

---

[5] As restated by the Court of Appeals, the twelve issues were as follows:

1. Whether the trial court erred in denying the [Plaintiffs'] Motion for New Trial or to Alter or Amend the Judgment?

2. Whether the trial court erred in failing to charge the jury as to the specific effect a finding of fault on the part of non-party, Horn Lake, would have on the ultimate outcome?

3. Whether the jury's verdict was contrary to the weight of the evidence and the trial court, as "thirteenth juror[,]" should have set the verdict aside?

4. Whether the trial court erred in permitting Horn Lake to be placed on the verdict form?

5. Whether the trial court erred in granting partial summary judgment to Memphis Landsmen and Budget on the products liability claim?

6. Whether the trial court erred in granting Budget a directed verdict on the Lakes' claims of agency?

7. Whether the trial court erred in admitting evidence of compliance with government standards?

(continued...)

issue—"[w]hether the trial court erred by failing to grant a directed verdict to Budget on the issue of whether Budget owed a legal duty to the [Plaintiffs]"—and Metrotrans presented three issues, one of which was whether the trial court should have found that the Plaintiffs' claims were preempted by federal law.[6] Id.

The Court of Appeals held that FMVSS 205 and 208 preempted the Plaintiffs' claims based on the use of tempered glass in the side windows and the failure to provide passenger seatbelts. Id. at *4-11. Having determined that preemption precluded recovery on these claims, the Court of Appeals observed that the Plaintiffs' only remaining cause of action was based on the use of perimeter seating. Even though the Defendants did not present as an issue the trial court's denial of the Defendants' motions for a directed verdict as to the perimeter-seating claim, the Court of Appeals chose to address that ruling sua sponte in order "to fully adjudicate" the matter, concluding that there was no evidence that Lake was seated at the time of the accident and that, in consequence, the Plaintiffs had not established that the perimeter seating configuration caused Lake's injuries. Id. at *12-13. Having determined that the Plaintiffs' seatbelt and window-glass claims were preempted and that the evidence

_____

[5](...continued)

8.      Whether the trial court erred in admitting a letter from former [National Highway Traffic Safety Administration] general counsel dated August 19, 1992 into evidence?

9.      Whether the trial court erred in denying admission into evidence a letter dated December 17, 1996, from then acting [National Highway Traffic Safety Administration] chief counsel to Attorney Donna Oshiro of Hawaii?

10.     Whether the trial court erred in denying the [Plaintiffs'] motion in limine to preclude evidence of Mr. Lake's alcohol use and its possible effects on his brain injury?

11.     Whether the trial court erred in admitting into evidence a series of letters that were made exhibits to Dr. Helge Frank's deposition?

12.     Whether all of the above errors, singularly or in combination, constituted error which materially prejudiced the [Plaintiffs] and more probably than not affected the judgment or resulted in prejudice to the judicial process?

Id.

[6] The other two issues raised by Metrotrans, as restated by the Court of Appeals, were (1) "[w]hether the trial court should have granted a directed verdict against the [Plaintiffs] based on the use of tempered glass in the windows," and (2) "[w]hether the trial court should have charged the jury as to the rebuttable presumption that a product which complies with government standards is not unreasonably dangerous, as provided in [Tennessee Code Annotated section 29-28-104]." Id. at *4.

was insufficient as to their seating-configuration claim, the Court of Appeals found it unnecessary to address any of the remaining issues.  Id. at *13.

Subsequent to Lake I, the United States Supreme Court issued its ruling in Williamson v. Mazda Motor of America, Inc., 131 S. Ct. 1131 (2011), which specifically addressed when federal motor vehicle regulations preempt tort claims arising under state law.  In an order issued on March 24, 2011, this Court granted the Plaintiffs' application for permission to appeal from the decision in Lake I "for the purpose of remanding the case to the Court of Appeals for reconsideration in light of the United States Supreme Court's opinion in Williamson."  On remand, the Court of Appeals found that its preemption analysis in Lake I was "not disturbed by the Williamson decision."  Lake v. Memphis Landsmen, L.L.C., W2011-00660-COA-RM-CV, 2011 WL 5022790, at *1 (Tenn. Ct. App. Oct. 21, 2011) ("Lake II").  Further, the Court of Appeals declined to revisit its determination that the Defendants were entitled to a directed verdict on the perimeter-seating claim.  Id. at *7-8. We granted the Plaintiffs' application for permission to appeal from Lake II in order to consider the preemptive effect of FMVSS 205 and 208 and the viability of the perimeter-seating claim.

## II. Analysis
The issues addressed in this appeal are, first, whether the Plaintiffs' claims premised on the lack of passenger seatbelts in the bus and the material used in the window glass are preempted by federal law; and second, whether the evidence is sufficient to support the claim based on the seating configuration.

### A. Preemption
Preemption involves a question of law that is subject to de novo review on appeal. Leggett v. Duke Energy Corp., 308 S.W.3d 843, 851 (Tenn. 2010) (quoting Friberg v. Kan. City S. Ry. Co., 267 F.3d 439, 442 (5th Cir. 2001)).  The Defendants urge this Court to affirm the determination of the Court of Appeals that FMVSS 208 preempts the seatbelt claim and that FMVSS 205 preempts the window-glass claim.  The Plaintiffs contend that neither claim would conflict with the purposes and objectives of the federal regulations governing passenger seatbelts and window-glass materials in buses and, therefore, neither claim is subject to preemption.

### 1. Principles of Preemption Law
The legal basis for the doctrine of preemption is the Supremacy Clause of the United States Constitution, which mandates that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Pursuant to the Supremacy

-9-

Clause, a law enacted by Congress may preempt an otherwise valid state law, rendering it without effect. Leggett, 308 S.W.3d at 853. Consistent with this principle, a federal regulation promulgated by an agency pursuant to its congressionally delegated authority may preempt a state tort suit. See Geier v. Am. Honda Motor Co., 529 U.S. 861, 886 (2000); MCI Sales & Serv., Inc. v. Hinton, 329 S.W.3d 475, 482 (Tex. 2010) (citing City of N.Y. v. FCC, 486 U.S. 57, 63-64 (1988)).

The United States Supreme Court has identified two fundamental principles that must guide any preemption analysis. First, no matter what type of preemption is at issue, "the purpose of Congress is the ultimate touchstone." Wyeth v. Levine, 555 U.S. 555, 565 (2009) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). Second, in conducting any preemption inquiry, courts must "start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress"—particularly when the federal law in question pertains to "a field which the States have traditionally occupied." Id. (quoting Medtronic, 518 U.S. at 485) (internal quotation marks omitted); see also Leggett, 308 S.W.3d at 854; Morgan v. Ford Motor Co., 680 S.E.2d 77, 83 (W. Va. 2009) ("Preemption of topics traditionally regulated by states—like health and safety—is greatly disfavored in the absence of convincing evidence that Congress intended for a federal law to displace a state law.").

Courts recognize both express preemption, which occurs when Congress explicitly dictates that a federal law supplants contrary state law, and implied preemption, which typically falls into one of three categories: (1) field preemption, (2) direct conflict preemption, or (3) "purposes and objectives" conflict preemption.[7] Leggett, 308 S.W.3d at 853. "Field preemption occurs when federal regulation of a field is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" Id. at 854 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Direct conflict preemption arises from "an inescapable contradiction between state and federal law—for example, 'where it is impossible for a private party to comply with both state and federal law.'" Id. at 853 (quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73 (2000)). Purposes and objectives conflict preemption—the only category of preemption at issue in this appeal—occurs when a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of a federal law." Williamson, 131 S. Ct. at 1136 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

---

[7] Courts interchangeably refer to this latter type of preemption as "purposes and objectives" preemption, "frustration-of-purpose" preemption, and "obstacle" preemption. See, e.g., Geier, 529 U.S. at 873-74; id. at 908 n.22 (Stevens, J., dissenting).

In order to determine whether a state law impermissibly conflicts with the purposes and objectives of a federal regulation, courts must look to the regulation's "history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's pre-emptive effect." Id. As the United States Supreme Court has cautioned, courts must remain mindful "that it is Congress rather than the courts that preempts state law"; in keeping with this principle, courts must guard against implied preemption analysis devolving into a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." Chamber of Commerce of U.S. v. Whiting, 131 S. Ct. 1968, 1985 (2011) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)) (internal quotation marks omitted); see also Wyeth, 555 U.S. at 604 (Thomas, J., concurring in judgment only) (concluding that "broad evaluations of the 'purposes and objectives' embodied within federal law" result in "the illegitimate—and thus, unconstitutional—invalidation of state laws").

## 2. Preemptive Effect of FMVSS 205 and 208

The federal regulations pertaining to motor vehicle safety stem from the National Traffic and Motor Vehicle Safety Act of 1966 (the "Safety Act"), 15 U.S.C. §§ 1381–1431 (1988) (current version at 49 U.S.C. §§ 30101–30183 (2006)). "The purpose of [the Safety Act] is to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101. To achieve this objective, Congress has delegated to the Secretary of Transportation the authority to "prescribe motor vehicle safety standards," id. § 30111(a), which are defined as "minimum standard[s] for motor vehicle or motor vehicle equipment performance," id. § 30102(a)(9).[8] The Secretary of Transportation has delegated this rulemaking authority to the National Highway Traffic Safety Administration ("NHTSA"), 49 C.F.R. § 1.95(a) (2012), which promulgated both of the regulations at issue in this instance: FMVSS 205 and 208. See id. §§ 571.205, .208. Keeping in mind the principles of preemption discussed above, the key question in this appeal is whether these motor vehicle safety standards preempt the Plaintiffs' seatbelt and window-glass claims.

## a. FMVSS 208 and Passenger Seatbelts

FMVSS 208 "specifies performance requirements for the protection of vehicle occupants in crashes." 49 C.F.R. § 571.208, S1. The purpose of FMVSS 208, according to

---

[8] The Safety Act contains an express preemption clause, which prohibits states from enacting any standard that differs from a federal motor vehicle safety standard that is "applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment." Id. § 30103(b)(1). The Safety Act also contains a saving clause, however, which provides that "[c]ompliance with a motor vehicle safety standard . . . does not exempt a person from liability at common law." Id. § 30103(e). Reading these provisions together, the United States Supreme Court has clarified that the saving clause exempts state law tort suits from express preemption but does not preclude application of ordinary preemption principles. See Geier, 529 U.S. at 868-69, 874.

its own text, "is to reduce the number of deaths of vehicle occupants, and the severity of injuries, by . . . specifying equipment requirements for active and passive restraint systems." Id. § 571.208, S2. Throughout its history, the standard has remained silent on the issue of passenger seatbelts with regard to the category of the vehicle at issue here—buses with a GVWR greater than 10,000 pounds.[9]

The original version of FMVSS 208 contained provisions applicable to all buses manufactured on or after January 1, 1972, requiring either a "complete . . . protection system" or a "belt system," but this requirement applied only to the driver, not passengers. See id. § 571.208, S4.4.1. In 1973, NHTSA issued a notice "propos[ing] a new motor vehicle safety standard to require buses to have passenger seats that are stronger, higher, and less hostile on impact than present seats." Bus Passenger Seating and Crash Protection, 38 Fed. Reg. 4776, 4776 (Feb. 22, 1973). The proposed standard mandated seatbelts and other seating specifications for all seating positions in all buses. Id. at 4776-77. After studying the issue for over a year, NHTSA withdrew the proposed new standard, citing cost concerns and statistics indicating that seating improvement would not substantially reduce injuries in intercity and transit buses, largely because, according to surveys, few passengers in those types of buses would use seatbelts if provided. School Bus Passenger Crash Protection, 39 Fed. Reg. 27,585, 27,585 (July 30, 1974). In light of these considerations, NHTSA concluded that the passenger seatbelt requirement and the other proposed seating requirements were not necessary "because of the adequacy of th[e] seating as presently designed." Id. NHTSA opted instead to propose a different set of seating requirements to apply exclusively to school buses, which were eventually adopted. See id.; see also 49 C.F.R. § 571.222 (2012).

In 1988, NHTSA proposed a rule that would require "manufacturers to install lap/shoulder belts in all forward-facing rear outboard seating positions in passenger cars, light trucks, multipurpose passenger vehicles (e.g., passenger vans and utility vehicles), and small buses." Occupant Crash Protection, 53 Fed. Reg. 47,982, 47,982 (Nov. 29, 1988). In its notice of the proposed rule, NHTSA emphasized the extensive research "show[ing] that lap belts in the rear seat are effective in preventing deaths and reducing injuries," and it further concluded that lap-and-shoulder belts in rear seating positions, including the passenger seats of small buses, would bring about increased safety benefits. Id. at 47,984. The proposed rule was adopted in 1989. Occupant Crash Protection, 54 Fed. Reg. 46,257, 46,257 (Nov. 2, 1989) (codified at 49 C.F.R. § 571.208, S4.4.3 (2012)). In considering whether to adopt this rule, however, the agency specifically exempted large buses from consideration. Id. at 46,261; Occupant Crash Protection, 53 Fed. Reg. at 47,987. As a result,

---

[9] For ease of reference, we will hereinafter refer to buses with a GVWR greater than 10,000 pounds as "large buses" and buses with a GVWR of 10,000 pounds or less as "small buses."

the version of FMVSS 208 in effect at the time the bus at issue was manufactured—like the current version—requires either a complete protection system or a seatbelt for the driver but does not require passenger seatbelts for large buses. See 49 C.F.R. § 571.208, S4.4.2.1–.2, S4.4.3.1.

Not surprisingly, the Plaintiffs and the Defendants advance differing interpretations of the history of FMVSS 208 as well as NHTSA's explanations for not imposing a passenger seatbelt requirement for large buses.[10] The Defendants assert that the requirement of a seatbelt only for the driver position in large buses is tantamount to "an explicit statement that passenger seatbelts are not required," reflecting a "conscious decision" by NHTSA "not to require seatbelts in passenger seats" based upon the determination that large buses are safe without passenger seatbelts. The Defendants also draw our attention to a letter dated August 19, 1992, in which NHTSA's Chief Counsel, Paul Jackson Rice, opined that FMVSS 208 would preempt proposed legislation under consideration in New York that would have imposed a passenger seatbelt requirement for large buses. This opinion was based on Rice's assessment that "NHTSA [had] expressly determined that there is not a safety need for safety belts or another type of occupant crash protection [in passenger] seating positions." The Plaintiffs, on the other hand, dispute the notion that NHTSA has interpreted FMVSS 208 to preempt state tort suits and argue that prohibiting passenger seatbelts is not a significant regulatory objective of FMVSS 208.

In support of their respective contentions, the parties rely upon a series of United States Supreme Court decisions addressing the preemption of state tort claims by federal regulations. The Defendants, like our Court of Appeals, rely heavily upon Geier, a 2000 decision in which the Supreme Court concluded that the 1984 version of FMVSS 208 preempted a state law tort claim premised on the failure of an auto-manufacturer to equip the plaintiff's vehicle with an airbag. 529 U.S. at 864-65. At issue in Geier was a portion of FMVSS 208 that required manufacturers to equip their vehicles with "passive restraint systems," but at the same time permitted manufacturers "to choose among different passive restraint mechanisms, such as airbags, automatic belts, or other passive restraint technologies to satisfy that requirement." Id. at 878. The key feature of the regulation requiring preemption was that the passive restraint standard "deliberately sought variety—a mix of

---

[10] In support of their respective arguments about the history of the regulations and the agency's explanation of the relevant objectives, the parties cite extensive material postdating the manufacture of the bus at issue. Consistent with United States Supreme Court precedent, we will limit our consideration of these issues to the version of the regulations in effect in October of 1995, when the bus was manufactured. See, e.g., Williamson, 131 S. Ct. at 1134, 1137-39 (limiting consideration of regulatory history and agency explanation of objectives to the version of the applicable regulation in effect at the time of manufacture); Geier, 529 U.S. at 864, 875-83 (same). Of course, more recent materials may be relevant in regard to the agency's current views of the preemptive effect of its regulations.

several different passive restraint systems." Id. The Court emphasized that NHTSA had rejected a strict airbag requirement in favor of preserving manufacturer choice as to passive restraints because of "safety concerns (perceived or real) associated with airbags," high production costs, and negative public perception. Id. at 878-79. The Court in Geier applied the preemption bar, concluding that a rule of state tort law imposing a duty to install an airbag "would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors. It thereby would have presented an obstacle to the variety and mix of devices that the federal regulation sought." Id. at 881.

The Plaintiffs rely primarily on two subsequent United States Supreme Court decisions that cautioned against an overly broad application of the ruling in Geier. In the first such case, Sprietsma v. Mercury Marine, the Court concluded that a Coast Guard regulation, which did not require propeller guards on boat motors, did not implicitly preempt a state law tort claim alleging negligence on the part of a manufacturer for failing to install such a guard. 537 U.S. 51, 64-68 (2002). The regulatory history in Sprietsma indicated that the Coast Guard had considered adopting a rule requiring propeller guards but had ultimately decided "to take no regulatory action." Id. at 65. The Coast Guard's reasons for not requiring propeller guards included the high cost of retrofitting existing boats, the lack of a universally acceptable guard for "all boats and motors," and data suggesting that "propeller guards might prevent penetrating injuries but increase the potential for blunt trauma caused by collision with the guard." Id. at 61. The Court rejected the manufacturer's attempt to equate the Coast Guard's decision not to adopt a propeller-guard requirement with a policy against propeller guards, explaining that "[i]t is quite wrong to view th[e] decision [not to require propeller guards] as the functional equivalent of a regulation prohibiting all States . . . from adopting such a regulation." Id. at 65. Distinguishing Geier, the Court further observed that the Coast Guard's stated reasons for not adopting a propeller guard requirement

> reveal[] only a judgment that the available data did not meet the . . . "stringent" criteria for federal regulation. The Coast Guard did not take the further step of deciding that, as a matter of policy, the States and their political subdivisions should not impose some version of propeller guard regulation, and it most definitely did not reject propeller guards as unsafe. The Coast Guard's apparent focus was on the lack of any "universally acceptable" propeller guard for "all modes of boat operation." But nothing in its official explanation would be inconsistent with a tort verdict premised on a jury's finding that some type of propeller guard should have been installed on this particular kind of boat equipped with respondent's particular type of motor. Thus, although the Coast Guard's decision not to require propeller guards was

-14-

undoubtedly intentional and carefully considered, it does not convey an "authoritative" message of a federal policy against propeller guards.

Id. at 66-67 (emphasis added) (footnote omitted).

The Plaintiffs also rely upon the 2011 decision in Williamson, which involved a tort claim alleging that a minivan occupant died in an accident because her rear inner seat was equipped with only a lap belt instead of lap-and-shoulder belts. 131 S. Ct. at 1134. At issue was a different provision of the same version of FMVSS 208 applicable in this case, which permitted auto manufacturers to choose between lap belts and lap-and-shoulder belts for rear inner seats. Id. The Court recognized the similarity of the preemption question in Geier, noting that as in that case, FMVSS 208 left manufacturers with a choice that would be restricted by a verdict imposing liability; however, the Court ultimately distinguished Geier, concluding that "manufacturer choice was an important regulatory objective" in Geier, whereas the choice between lap belts and lap-and-shoulder belts at issue in Williamson was not "a significant regulatory objective." Id. at 1137. The Court reasoned that, in contrast to the extensive regulatory history showing a deliberate preservation of manufacturer choice in Geier, the choice between seatbelts permitted under FMVSS 208 had nothing to do with consumer acceptance, safety concerns, or an interest in assuring a mix of various devices. Id. at 1137-38. Rather, the primary reasons for allowing manufacturers to choose between lap-only and lap-and-shoulder belts were the high cost associated with lap-and-shoulder belts and their potential interference with exit and entry due to "'stretch[ing] the shoulder belt across the aisleway.'" Id. at 1138 (alteration in original) (quoting Occupant Crash Protection, 54 Fed. Reg. at 46,258). Justice Sotomayor wrote a separate concurring opinion "to emphasize the Court's rejection of an overreading of Geier that has developed since that opinion was issued." Id. at 1140 (Sotomayor, J., concurring). In her concurrence, Justice Sotomayor explained that

> the mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied pre-emption; courts should only find pre-emption where evidence exists that an agency has a regulatory objective—e.g., obtaining a mix of passive restraint mechanisms, as in Geier—whose achievement depends on manufacturers having a choice between options. A link between a regulatory objective and the need for manufacturer choice to achieve that objective is the lynchpin of implied pre-emption when there is a saving clause.

Id. (emphasis added).

-15-

Several other jurisdictions have addressed and rejected the purposes and objectives category of implied federal preemption in the context of the failure to install seatbelts in large buses. See, e.g., Soto v. Tu Phuoc Nguyen, 634 F. Supp. 2d 1096, 1106-07 (E.D. Cal. 2009); Doomes v. Best Transit Corp., 958 N.E.2d 1183, 1190-91 (N.Y. 2011); MCI, 329 S.W.3d at 494-95.[11] In accord with the rationale in these holdings, it is our view that FMVSS 208 does not preempt the Plaintiffs' claim based on the failure to provide passenger seatbelts.

As with the Coast Guard regulation in Sprietsma and the motor vehicle safety standard in Williamson, the history of FMVSS 208 indicates a decision not to require passenger seatbelts in large buses but does not suggest a regulatory policy forbidding states from imposing such a requirement. Prior to the manufacture of the bus at issue, NHTSA only once, from 1973 to 1974, considered adopting a passenger seatbelt requirement for large buses, and its reason for abandoning the proposed rule was that, in view of surveys suggesting that few passengers on intercity and transit buses would use seatbelts, the safety benefits of installing passenger seatbelts did not justify the cost. See School Bus Passenger Crash Protection, 39 Fed. Reg. at 27,585; see also MCI, 329 S.W.3d at 491 ("NHTSA simply determined that the cost of installing seatbelts was not justified given the low usage rates."). In the late 1980s, NHTSA considered and eventually adopted a requirement for passenger lap-and-shoulder belts in several categories of vehicles, including small buses; large buses, however, were specifically excluded from consideration. Of note, the decision to exclude large buses from consideration had to do with the inherent differences between large buses and other types of vehicles, and did not reflect any determination that passenger seatbelts would be unsafe in large buses. See Occupant Crash Protection, 54 Fed. Reg. at 46,261; Occupant Crash Protection, 53 Fed. Reg. at 47,987. To the contrary, NHTSA's notice of the proposed rule touted the efficacy of seatbelts in "preventing deaths and reducing injuries," with no distinction as to the type of vehicle involved. Occupant Crash Protection, 53 Fed. Reg. at 47,984.

In short, the regulatory history of FMVSS 208, like the history of the Coast Guard regulation in Sprietsma, demonstrates a determination by NHTSA that the relevant data—including costs and potential safety benefits—did not warrant a passenger seatbelt requirement for large buses. NHTSA did not, however, take "the further step of deciding that, as a matter of policy," states should not be permitted to impose a passenger seatbelt requirement. Sprietsma, 537 U.S. at 67. In contrast to the regulation in Geier, there is

---

[11] The Defendants have cited two unpublished decisions reaching the opposite conclusion as to this issue. See Surles v. Greyhound Lines, Inc., No. 4:01-CV-00107, 2005 WL 1703153, at *4-6 (W.D. Tenn. July 20, 2005) (holding that a claim premised on a need for passenger seatbelts in large buses conflicts with the finding of NHTSA that there is no such safety need); Schunck v. Del. Transit Corp., No. 06C-07-008, 2007 WL 1748647, at *3 (Del. Super. Ct. June 1, 2007) (same).

nothing to indicate that NHTSA based its decision not to require passenger seatbelts in large buses on any concern about the safety of passenger seatbelts or the need to preserve manufacturers' choice to opt for other comparable safety measures. In consequence, the history of FMVSS 208 and NHTSA's stated reasons for not requiring passenger seatbelts in large buses weigh in favor of upholding the presumption against preemption of a claim based upon the failure to install seatbelts.

NHTSA's current views of the preemptive effect of FMVSS 208 further counsel against preemption. In this regard, the Defendants' reliance on the 1992 letter by NHTSA's former chief counsel is misplaced. As noted by the Texas Supreme Court, "The letter of NHTSA's chief counsel in 1992 is unremarkable insofar as it concludes that the Safety Act would preempt nonidentical New York legislation—the Act's express preemption clause compels such a conclusion." MCI, 329 S.W.3d at 492 (emphasis added) (citing 49 U.S.C. § 30103(b)(1)). Moreover, the primary rationale expressed in the letter is that NHTSA had determined that there was "not a safety need" justifying a passenger seatbelt requirement for large buses. There is a critical distinction, however, between an agency determination that there is no need to adopt a safety requirement and an agency determination that states should not be permitted to adopt such a requirement, as was the case in Geier. See Soto, 634 F. Supp. 2d at 1102-03 ("[A]n agency decision that a proposed requirement should not be implemented may result in the preemption of state law, while a determination that a requirement need not be enacted . . . will not.").

Furthermore, a more recent indicator of NHTSA's view as to the preemptive effect of FMVSS 208 is contained in the brief for the United States submitted in Williamson, which was signed by officials in the Department of Transportation and NHTSA, as well as the United States Solicitor General[12] at that time, Elena Kagan.[13] The brief cited our Court of Appeals' decision in Lake I as one of several decisions that erroneously accorded preemptive effect to FMVSS 208 based on an overly broad reading of Geier, which conflicted with the agency's view that a regulatory decision not to implement a safety requirement because of cost or feasibility is insufficient to trigger federal preemption. See Brief for the United States as Amicus Curiae at 15, 20-21, Williamson, 131 S. Ct. 1131 (No. 08-1314), 2010 WL 1653014. In our assessment, the United States' amicus brief in Williamson must be read as expressing the agency's view that FMVSS 208 does not preempt claims such as the passenger seatbelt claim brought by the Plaintiffs in this case. While not determinative, the agency's "thorough understanding of its own regulation" and "'unique[] qualifi[cation]' to

---

[12] The United States Solicitor General is authorized to express the views of federal agencies as to the preemptive effect of their regulations. See Sprietsma, 537 U.S. at 68; Geier, 529 U.S. at 883-84.

[13] On August 7, 2010, Elena Kagan was sworn in as a Justice of the United States Supreme Court.

comprehend the likely impact of state requirements" require that we give due weight to its views on the preemptive effect of the regulation at issue. Geier, 529 U.S. at 883 (quoting Medtronic, 518 U.S. at 496).

In summary, the history of seatbelt regulation under FMVSS 208, NHTSA's explanation of its objectives, and the agency's views on the preemptive effect of the regulation compel the conclusion that FMVSS 208 does not preempt the Plaintiffs' claim premised on the lack of passenger seatbelts.

### b. FMVSS 205 and Window-Glass Materials

A more difficult question is whether the Plaintiffs' claim as to the Defendants' use of tempered rather than laminated glass in the side windows of the bus is preempted by FMVSS 205, which "specifies requirements for glazing materials for use in motor vehicles." 49 C.F.R. § 571.205, S1. FMVSS 205 serves three purposes: "to reduce injuries resulting from impact to glazing surfaces, to ensure a necessary degree of transparency in motor vehicle windows for driver visibility, and to minimize the possibility of occupants being thrown through the vehicle windows in collisions." Id. § 571.205, S2. The version of FMVSS 205 in effect at the time the bus in this case was manufactured incorporates the American National Standards Institute's "'Safety Code for Safety Glazing Materials for Glazing Motor Vehicles Operating on Land Highways' Z-26.1-1977, January 26, 1977, as supplemented by Z26.1a, July 3, 1980" ("ANSI Z26.1"). Glazing Materials, 49 Fed. Reg. 6732, 6732-34 (Feb. 23, 1984). ANSI Z26.1—and by extension FMVSS 205—allows several types of glazing materials, including laminated glass, which may be used anywhere in the vehicle, and tempered glass, which may be used anywhere except for the windshield. See Morgan, 680 S.E.2d at 87 & n.10 (discussing the glazing requirements of ANSI Z26.1). In reference to the different glass materials permitted under ANSI Z26.1, the standard recognizes that "[o]ne safety glazing material may be superior for protection against one type of hazard, whereas another may be superior against another type. . . . [N]o one type of safety glazing material can be shown to possess the maximum degree of safety under all conditions." Id. at 87.

In 1988, NHTSA issued two notices announcing that it was considering new requirements to reduce the risk of ejections in crashes; both notices addressed the suitability of requiring laminated glass or other advanced glazing in side windows. Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed. Reg. 41,365, 41,366 (June 18, 2002) (citing Side Impact Protection—Light Trucks, Vans, and Multipurpose Passenger Vehicles, 53 Fed. Reg. 31,716 (Aug. 19, 1988); Side Impact Protection—Passenger Cars, 53 Fed. Reg. 31,712 (Aug. 19, 1988)). Of note, these proposed requirements did not apply to large buses. Side Impact Protection—Light Trucks, Vans, and Multipurpose Passenger Vehicles, 53 Fed. Reg. at 31,716 (noting that new requirements were only considered for "trucks, buses and multipurpose passenger vehicles with a [GVWR] of 10,000 pounds or less"). The comments

received on the proposed requirements raised several issues, including the high cost of laminated glass and "whether this material would actually increase injuries to belted occupants due to head injury, neck loading, and lacerations." Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed. Reg. at 41,366.

In 1992, following a mandate from Congress to address concerns over rollover protection, NHTSA issued a planning document that outlined various potential approaches to reduce rollover-related injuries and fatalities, including a section concerning the possibility of mitigating the risk of ejection by imposing stricter requirements for side window glass. Id. (citing Planning Document for Rollover Prevention Rulemaking, 57 Fed. Reg. 44,721 (Sept. 29, 1992)). The comments on the 1992 planning document were similar in substance to the comments on the 1988 proposals, presenting, among other concerns, high cost and "the potential for additional contact injuries." Id. In 1995, at the time Metrotrans manufactured the bus at issue here, NHTSA was in the process of considering the proposed standards and approaches in the 1988 rulemaking notices and the 1992 planning document, including the possibility of requiring laminated glass in side windows to protect against ejection.[14] See id.

The Defendants compare the history of FMVSS 205 to the passive restraint regulation at issue in Geier, emphasizing that FMVSS 205 offers manufacturers a choice regarding which type of glass to use in side windows. The Defendants argue that to limit this choice by requiring laminated glass would frustrate FMVSS 205's purpose of reducing injuries from impact to glazing surfaces, given the increased probability of neck injury upon impact with laminated glass. In response, the Plaintiffs aver that any safety tradeoff between minimizing ejection risk and minimizing neck injuries does not amount to a significant regulatory objective or purpose and does not, therefore, implicate federal preemption.

Each of these arguments has prevailed in similar cases before courts in other jurisdictions, which are split on the question of the preemptive effect of FMVSS 205. Two state supreme courts have determined that tort suits based on the negligent use of tempered glass were preempted by FMVSS 205. In Morgan—a decision that predated Williamson by two years—the Supreme Court of Appeals of West Virginia concluded that FMVSS 205 preempted a tort claim arising from an accident in which a 1999 Ford Expedition rolled over,

_____

[14] In a 2002 notice that postdated the events in this case, NHTSA decided to terminate its consideration of a requirement for laminated glass or other types of advanced glazing in side windows. The reasons given by NHTSA for its decision included the high cost of laminated glass and other advanced glazing, the increased risk of impact neck injuries for belted occupants, and the advent of other, potentially preferable ejection mitigation systems, such as side air curtains. See id. at 41,366-67. While we do not consider the 2002 notice to be part of the history of the version of FMVSS 205 applicable in this case, we note this development because, as explained below, it has factored significantly in other courts' analyses in similar cases.

-19-

causing the partial ejection of one of the occupants through a side window made of tempered glass. 680 S.E.2d at 81. The court expressed the view that Geier was "flawed," but nevertheless relied upon that decision as binding precedent in holding that the tort claim impermissibly conflicted with NHTSA's decision not to mandate laminated glass in side windows—a decision based in part on the agency's concern over "a slightly increased risk of neck injuries." Id. at 94. Similarly, in Priester v. Cromer, the South Carolina Supreme Court held that FMVSS 205 preempted a tort claim seeking damages for the death of the occupant of a 1997 Ford F-150 pick-up truck who was ejected through a tempered glass side window during a rollover accident. 697 S.E.2d 567, 571 (S.C. 2010). When the United States Supreme Court granted certiorari and remanded the case for reconsideration in light of Williamson, the South Carolina Supreme Court reaffirmed its prior decision. Priester v. Cromer, 736 S.E.2d 249, 260 (S.C. 2012). As in Morgan, the South Carolina court focused on the choice of materials for side window glass permitted under FMVSS 205, finding that the "increased risk of injury to belted passengers" in vehicles with laminated glass side windows precluded a state tort rule that would effectively require laminated glass. Id. at 260.

Other courts have declined to give preemptive effect to FMVSS 205. In O'Hara v. General Motors Corp., the Fifth Circuit Court of Appeals determined that the objectives of FMVSS 205 were not in conflict with a tort claim seeking damages for injuries sustained by an occupant of a 2004 Chevrolet Tahoe who was partially ejected during a rollover accident. 508 F.3d 753, 762-63 (5th Cir. 2007). Analogizing FMVSS 205 to the Coast Guard regulation in Sprietsma, the Fifth Circuit reasoned that NHTSA had not rejected laminated glass as unsafe, but rather had decided to allow several options for side window glass in keeping with the function of FMVSS 205 as a "minimum safety standard," the purposes of which were not inconsistent with a state law tort rule imposing a more demanding standard. Id. at 763. In MCI, the Texas Supreme Court likewise found that FMVSS 205 did not preempt claims by passengers of a large bus who were ejected through side windows made of tempered glass during an accident in which the bus tipped onto its side and slid across a highway into a ditch. 329 S.W.3d at 479-80. In reaching this conclusion, the Texas court observed that unlike the passive restraint regulation in Geier, which deliberately sought to preserve a mix of options in furtherance of a significant regulatory objective, FMVSS 205 fell short of demonstrating a "positive desire to preserve the use of tempered glass in windows by forbidding contrary state regulation." Id. at 497.

Upon consideration of the decisions on both sides of this issue from other jurisdictions and the decisions of the United States Supreme Court, we conclude that FMVSS 205 does not preempt that portion of the Plaintiffs' claim based upon the use of tempered glass side windows. Initially, we note that the decisions giving preemptive effect to FMVSS 205 placed significant weight on NHTSA's 2002 notice announcing its decision to terminate consideration of a requirement for laminated glass or other types of advanced glazing in side

windows;[15] as noted, however, that decision was not part of the regulatory history of the version of FMVSS 205 in effect at the time Metrotrans manufactured the bus at issue here in 1995.

Looking to the regulatory history of the version of FMVSS 205 in effect in 1995, there is no indication that the primary concern raised by the Defendants—the increased risk of impact neck injuries associated with laminated glass—motivated NHTSA's decision to give manufacturers the option of installing side windows made of tempered glass rather than requiring laminated glass. Moreover, while one of the objectives of FMVSS 205 is "to reduce injuries resulting from impact to glazing surfaces," as several courts and NHTSA have noted, the increased risk of impact neck injury associated with laminated glass applies primarily to belted occupants. See, e.g., Priester, 736 S.E.2d at 260 (noting "the additional risk of neck injury that advanced glazing imposes upon belted passengers" (emphasis added)); Withdrawal of Advance Notices of Proposed Rulemaking, 67 Fed. Reg. at 41,366 (noting the concern that laminated glass may "actually increase injuries to belted occupants" (emphasis added)). The problem with the Defendants' position is that the bus at issue did not have passenger seatbelts. Thus, the concern that laminated glass may be more dangerous for belted passengers does not apply under the circumstances of this case, and the Plaintiffs' claim does not stand as an obstacle to the regulatory objective of reducing injuries caused by impact with glazing surfaces.

Nor are we persuaded by the Defendants' reliance on the statement from ANSI Z26.1 that "no one type of safety glazing material can be shown to possess the maximum degree of safety under all conditions." This explanation for giving manufacturers options as to materials for glazing surfaces is highly analogous to the Coast Guard's statement in Sprietsma that no single propeller guard was "universally acceptable" for "all modes of boat operation." Sprietsma, 537 U.S. at 67. The Court's assessment of that statement in Sprietsma applies with equal force here: "[N]othing in [the] official explanation would be inconsistent with a tort verdict premised on a jury's finding that some [particular] type of [window glass] should have been installed on this particular kind of [bus]." Id. For example, while FMVSS 205, through its incorporation of ANSI Z26.1, generally provides manufacturers with the option of installing side windows made of tempered glass, it would not be inconsistent with the purposes of FMVSS 205 for a jury to conclude that a bus that does not protect against ejection with seatbelts or compartmentalized seating should be equipped with side windows made of laminated glass. In fact, such a conclusion would be entirely consistent with FMVSS 205's objective of "minimiz[ing] the possibility of occupants being thrown through the vehicle windows in collisions." 49 C.F.R. § 571.205, S2.

---

[15] See, e.g., Priester, 736 S.E.2d at 257-60.

Furthermore, the regulatory history of FMVSS 205 more closely resembles the seatbelt regulation in Williamson than the passive restraint regulation in Geier. The factors that led the Court in Geier to conclude that manufacturer choice was a significant regulatory objective are largely absent here. As explained by the Texas Supreme Court, the regulation at issue in Geier "emphasize[d] the choice among options as an important and integral part of the overall safety scheme," whereas FMVSS 205 "merely narrows the range of manufacturers' choice of glazing materials from potentially unlimited to a short list." MCI, 329 S.W.3d at 497-98. Therefore, while FMVSS 205 provides manufacturers with a choice as to window-glass material, there is no evidence of "a regulatory objective . . . whose achievement depends on" that choice. Williamson, 131 S. Ct. at 1140 (Sotomayor, J., concurring). Finally, as with the passenger seatbelt claim discussed previously, we attach considerable weight to the statement in the amicus brief of the United States in Williamson, expressing the agency's view that our Court of Appeals' holding in Lake I, giving preemptive effect to FMVSS 205, constituted a misapplication of Geier. See Brief for the United States as Amicus Curiae at 20-21, Williamson, 131 S. Ct. 1131 (No. 08-1314), 2010 WL 1653014. Based upon our consideration of FMVSS 205's "history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's pre-emptive effect," Williamson, 131 S. Ct. at 1136, we conclude that FMVSS 205 does not preempt the claim of the Plaintiffs based on the use of tempered, rather than laminated, glass.

### B. Directed Verdict on Seating-Configuration Claim

The final issue we address is the sua sponte determination by the Court of Appeals that the trial court erred by failing to grant the Defendants a directed verdict as to the Plaintiffs' seating-configuration claim because of the lack of evidence that Lake was seated at the time of the accident. The Court of Appeals concluded that the perimeter seating configuration, even if unsafe, did not cause Lake's injuries because the alternative configuration of forward-facing rows would only protect seated occupants from ejection.

"A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case." Tenn. R. Civ. P. 50.01. Appellate courts must conduct a de novo review of a trial court's ruling on a motion for a directed verdict, applying the same standards that govern the trial court's determination. Brown v. Crown Equip. Corp., 181 S.W.3d 268, 281 (Tenn. 2005) (citing Gaston v. Tenn. Farmers Mut. Ins. Co., 120 S.W.3d 815, 819 (Tenn. 2003)). For a directed verdict to be appropriately granted, the evidence must be "susceptible to only one conclusion." Id. (citing Childress v. Currie, 74 S.W.3d 324, 328 (Tenn. 2002)). If "reasonable minds could . . . differ as to the conclusions to be drawn from the evidence," the motion must be denied. Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn. 1994). On appeal, courts must take the strongest legitimate view of the

evidence in favor of the non-moving party, disregarding all countervailing evidence. Brown, 181 S.W.3d at 281; Gaston, 120 S.W.3d at 819.

The Plaintiffs brought causes of action for negligence and products liability based on the perimeter seating configuration used in the bus in which Lake was injured. As noted by the Court of Appeals, see Lake I, 2010 WL 891867, at *12, both of these causes of action require the Plaintiffs to establish, among other things, that the conduct complained of—in this instance, the use of perimeter seating—was the cause in fact of the Plaintiffs' injuries. See Wilson v. Americare Sys., Inc., No. M2011-00240-SC-R11-CV, 2013 WL 658078, at *5 (Tenn. Feb. 25, 2013); Brown, 181 S.W.3d at 282. In order to show causation in fact, "[i]t is not necessary that the defendants' act be the sole cause of the plaintiff's injury, only that it be a cause." Wilson, 2013 WL 658078, at *5 (alteration in original) (quoting Hale v. Ostrow, 166 S.W.3d 713, 718 (Tenn. 2005)). Cause in fact is ordinarily a question for the jury, id. at *6, and, as with other factual questions, jurors are entitled "to use their common sense and to rely upon their life experiences in evaluating" the issue, Terry v. Plateau Electric Coop., 825 S.W.2d 418, 423 (Tenn. Ct. App. 1991).

The direct and circumstantial evidence presented at trial demonstrated that Lake was one of two passengers on the shuttle bus at the time of the collision. Neither passenger, therefore, was forced to stand due to a lack of available seating. The bus was traveling a distance of over two miles from the airport to Budget's rental car facility, and a significant portion of the route consisted of large, busy roads with a speed limit of fifty miles per hour. Lake was familiar with the route, as he had taken it several times during his frequent business trips to Memphis. While Wayne McCracken, the Plaintiffs' accident reconstruction expert witness, conceded that he was not present during the accident and had no first-hand information regarding Lake's position, his testimony indicated that Lake's ejection from one of the passenger side windows of the bus was consistent with his being seated in one of the inward-facing seats on the driver side at the time of the collision.

Taking the strongest legitimate view of this evidence in favor of the Plaintiffs, we cannot conclude that it is "susceptible to only one conclusion." Brown, 181 S.W.3d at 281. To the contrary, a reasonable juror, drawing upon his or her common sense and life experiences, could have inferred that Lake had opted to sit in one of the many available seats on the shuttle bus during the trip to the rental car facility.

While the parties do not dispute the evidence discussed above, which we have deemed sufficient to avoid a directed verdict, they dispute whether the fact that Lake was seated may be established by McCracken's testimony that, based upon the information made available to him regarding the accident, he had ascertained where Lake was seated at the time of the collision. The Defendants assert that this testimony by McCracken must have been based on

the statement made by the only other passenger on the bus, which had been provided to McCracken during the course of his investigation of the accident.[16] The Defendants contend that McCracken's "reliance [on the other passenger's statement] could not establish as a fact that Lake was seated, or otherwise make the hearsay statement admissible as fact."

Tennessee Rule of Evidence 703 allows an expert to base "an opinion or inference" on facts "of a type reasonably relied upon by experts in the particular field," even if the facts are not admissible. The rule further provides that "[f]acts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Tenn. R. Evid. 703; see also Shipley v. Williams, 350 S.W.3d 527, 559 (Tenn. 2011) ("Rule 703 allows an expert witness to develop an opinion based on facts or data that are inadmissible, but the rule instructs courts to disallow an expert's opinion based on facts or data that 'indicate a lack of trustworthiness.'" (quoting Tenn. R. Evid. 703)).

In this instance, there is no dispute that McCracken was entitled to rely upon the witness statement by the other passenger in developing his opinion. While McCracken indicated that the passenger's statement was among the materials he had reviewed, the statement was not disclosed to the jury, meaning that the trial court was not required to balance the probative value of the statement against its prejudicial effect. See Tenn. R. Evid. 703. The Defendants now insist that McCracken's testimony that he had ascertained where Lake was seated must have been derived from the witness statement and therefore constitutes inadmissible hearsay; however, they did not present a hearsay objection at trial, which "forecloses consideration of the issue on appeal." State v. Coker, 746 S.W.2d 167, 173 (Tenn. 1987) (refusing to consider improper admission of hearsay evidence on appeal where there had been no objection at trial), overruled on other grounds by State v. West, 19 S.W.3d 753, 756 (Tenn. 2000); see also State v. Walker, 910 S.W.2d 381, 386 (Tenn. 1995). In addition, McCracken testified that he had achieved an understanding of where Lake was seated based on all "the information that [he] had," without specifying that his understanding was based solely on the statement of the other passenger. Because McCracken's testimony as to where Lake was seated could have been based in part upon the other evidence at his disposal, including the accident photographs and his calculations regarding the ejection, we decline to exclude from consideration his testimony that he had ascertained where Lake was seated at the time of the accident, which bolsters the conclusion that the evidence was sufficient to establish causation.

---

[16] As noted, in the statement, which had been reviewed by McCracken but was not disclosed to the jury, the other passenger clearly indicated that Lake was seated at the time of the accident.

**III. Conclusion**

In summary, the relevant indicators of regulatory intent fail to demonstrate that the Plaintiffs' state law tort claims stand as an obstacle to the purposes and objectives of FMVSS 205 or 208. We conclude, therefore, that these federal regulations do not implicitly preempt the Plaintiffs' claims premised on the lack of passenger seatbelts and the use of tempered glass in the side windows of the bus. We further conclude that the evidence was sufficient to establish causation as to the Plaintiffs' claim premised on the use of perimeter seating. The judgment of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals to decide the remaining issues raised but not determined in the initial appeal. Costs are adjudged against Metrotrans, Landsmen, and Budget, for which execution may issue if necessary.

_____
GARY R. WADE, CHIEF JUSTICE