IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 4, 2018 Session

## STATE OF TENNESSEE, EX REL. HERBERT H. SLATERY, III, ET AL. V. VOLKSWAGEN AKTIENGESELLSCHAFT, ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 16-1044-I    Claudia Bonnyman, Chancellor

_____

### No. M2018-00791-COA-R9-CV

_____

At issue in this appeal is the breadth of federal preemption under Title II of the federal Clean Air Act, 42 U.S.C. §§ 7521 to 7590, for claims that pertain to: (1) the initial manufacture and installation of "defeat device" software in emissions control systems in automobiles, and (2) post-sale software updates of emissions control systems during manufacturer recalls. The State of Tennessee brought this action against several automobile manufacturers for violating state anti-tampering laws by tampering with the emissions control systems in more than 8,000 of their "clean diesel" vehicles that were registered and operated in Tennessee from 2008 to 2015. The manufacturers responded by filing Tenn. R. Civ. P. 12.02(6) motions to dismiss arguing that all of the claims were preempted by the federal Clean Air Act. The trial court dismissed the claims that pertained to the initial manufacture and installation of emissions control systems for automobiles as expressly preempted by Section 209(a) of the act; however, the court denied the manufacturers' motions to dismiss the claims that pertained to the post-sale software updates of emissions control systems during manufacturer recalls. We have determined that all of the State's claims are preempted by the federal Clean Air Act. Therefore, we affirm the dismissal of the claims related to the initial manufacture and installation of emissions control systems, reverse the decision to deny the Rule 12 motions to dismiss the post-sale software updates and installations, and remand with instructions to dismiss all claims.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court
Affirmed in Part; Reversed in Part and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Wilson S. Buntin, Senior Counsel; and Lauran M. Sturm, Assistant

General Counsel, Nashville, Tennessee, for the appellant, State of Tennessee, *ex rel*. Herbert H. Slatery III, in his official capacity as the Attorney General and Reporter, and Shari Meghreblian, Ph.D., in her official capacity as Commissioner of the Tennessee Department of Environment and Conservation.

John R. Bibb, Jr. and Ryan N. Clark, Nashville, Tennessee; Robert J. Giuffra, Jr., David M. J. Rein, and Matthew A. Schwartz, New York City, New York; and Judson O. Littleton, Washington, DC for the appellees, Volkswagen Aktiengesellschaft d/b/a Volkswagen AG, Audi AG, and Volkswagen Group of America, Inc.

James K. Vines, Atlanta, Georgia for the appellees, Dr. Ing. h. c. F. Porsche AG and Porsche Cars of North America, Inc.

## OPINION

On September 28, 2016, the State of Tennessee, by and through the Attorney General and on behalf of the Tennessee Department of Environment and Conservation, ("the State") commenced this action against several automobile manufacturers: Volkswagen Aktiengesellschaft (Volkswagen AG); Volkswagen Group of America, Inc.; Audi AG; Dr. Ing. h. c. F. Porche AG; and Porche Cars of North America, Inc. (collectively, "Defendants"). The complaint alleged that Defendants violated provisions of the Tennessee Air Quality Act, Tenn. Code Ann. §§ 68-201-101 to -121 ("the Tennessee Act"), by programming the computer software to function as a "defeat device," which illegally tampered with the vehicles' emissions control systems as the vehicles were driven.[1]

It was alleged that from approximately 2008 to 2015, Defendants knowingly engineered, manufactured, and sold diesel engine vehicles equipped with electronic control modules that adjusted the performance of the vehicles' emissions control systems to perform effectively during emissions testing and less effectively during normal operation and use.[2] Consequently, the vehicles purportedly met federal emissions

---

[1] Because this case was dismissed by the trial court upon Defendants' motions under Tenn. R. Civ. P. 12.02(6), our only source of the relevant facts is the Amended Complaint. Therefore, the factual history is taken from the allegations in the Complaint and Amended Complaint. The procedural history is taken from the record provided by the trial court.

[2] In 2014, West Virginia University completed a study commissioned by the International Council on Clean Transportation and prepared a report ("ICCT report"), finding that Defendants' vehicles, the 2012 Volkswagen Jetta (Generation 1) and the 2013 Passat (Generation 2), released up to 35 times the allowed amount of emissions when in normal, on-the-road use. When confronted by the Environmental Protection Agency (the "EPA") about the report, Defendants "waged a campaign to mislead and confuse regulators and the public about the true cause of the findings in the ICCT report,

(continued…)

standards when undergoing emissions tests; however, when driven, the vehicles emitted nitrogen oxide ("NOx") in excess of what is permitted under federal law.

As an additional "cheat," it was alleged that Defendants programmed the vehicle's on-board diagnostic system ("OBD") to falsely report that the vehicle's emissions system was working properly and compliant with all relevant emission requirements. The complaint alleged that this action had particular significance in Tennessee because Tennessee's inspection and maintenance test for emissions ("emissions test") does not measure the vehicle's emissions but instead relies on the vehicle's OBD to relay the information.

The emissions control systems at issue were installed in 12 Audi, Volkswagen, and Porche models equipped with 2.0 liter and 3.0 liter diesel engines sold in the United States between 2008 and 2015, which Defendants allegedly "marketed … to Tennesseans as new 'clean diesel' vehicles that are not only quiet, fuel efficient, and high performing, but also environmentally friendly by emitting low levels of [NOx]." It was further alleged that more than 8,000 of these vehicles were licensed and registered in Tennessee during the relevant time frame.

Defendants responded to the claims asserted in the original complaint ("pre-recall claims") by filing Tenn. R. Civ. P. 12.02(6) motions to dismiss for failure to state a claim, arguing that the State's claims were expressly preempted by Section 209(a) of the federal Clean Air Act, which states in pertinent part, "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). Before the motions to dismiss were heard, the State was granted permission to amend its complaint to include additional claims related to post-sale software updates and installations of emissions control systems by the automotive manufacturers as a result of manufacturer recalls of the vehicles in 2014 and 2015 ("post-sale recall claims"). In paragraphs 76 and 77 of the amended complaint, it is alleged:

76. In 2015, despite issuing two software recalls for its Generation 1 and Generation 2 vehicles to purportedly address the concerns raised by the ICCT report, [Defendants] used these recalls instead as an opportunity to refine the software in these vehicles to make it more efficient at rendering certain emission control systems inoperative in normal driving conditions,

---

which was Volkswagen's defeat device software." In September 2015, Defendants admitted that they equipped several of their vehicle models with defeat device software and testified to that effect before Congress shortly following. In January 2017, the federal government resolved its civil penalty claims against Defendants, and in March 2017, Defendants pleaded guilty to three federal offenses.

resulting in NOx emissions that continued to exceed applicable emissions standards.

77. The conduct described in paragraph 76 is commonly referred to as the "Field Fix." In 2014-2015, [Defendants] falsely told regulators and consumers that it was updating software to improve the performance of the vehicles subject to the recall, (which included existing, in-use vehicles sold years before) when in fact, [Defendants'] recall/maintenance was a [ruse] to improve the defeat device software. As Volkswagen AG admitted in its federal guilty plea agreement in March 2017, "Volkswagen employees knew that the update also used the steering wheel angle of the vehicle as a basis to more easily detect when the vehicle was undergoing emissions tests, thereby improving the defeat device's precision in order to reduce stress on the emissions control systems."

The amended complaint further alleged that by installing and using defeat device software and by updating such software in the "Field Fix," Defendants violated three provisions in the Tennessee Act and two implementing regulations. For one, the State alleged that Defendants violated Tenn. Code Ann. § 68-201-120, which states:

It is unlawful for any person to remove or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under the federal Clean Air Act … prior to its sale and delivery to the ultimate purchaser, or for any person knowingly to remove or render inoperative any such device or element of design after such sale and delivery to the ultimate purchaser.

Second, the State alleged that Defendants violated Tenn. Code Ann. § 68-201-112(a)(1), which provides that anyone who knowingly "[v]iolates or fails to comply with…any duly promulgated air pollution control regulation" is guilty of a Class C misdemeanor. The two regulations at issue are found at Tenn. Comp. R. & Regs. 1200-03-36-.03 and read as follows:

No person shall cause, suffer, allow, or permit tampering of a motor vehicle or motor vehicle engine that is in compliance with federal motor vehicle standards except where the purpose of modification or removal of the air pollution emission control device is to install another device which is equally effective in reducing emissions from the vehicle.

Tenn. Comp. R. & Regs. 1200-03-36-.03(1).

No person shall manufacture, sell, offer to sell, or install any part or component on a motor vehicle or motor vehicle engine where the purpose

of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine that is in compliance with the federal motor vehicle standards.

Tenn. Comp. R. & Regs. 1200-03-36-.03(2).

Third, the State contended that Defendants violated Tenn. Code Ann. § 68-201-112(a)(3), which provides that anyone who knowingly "[f]alsifies, tampers with, or renders inaccurate any monitoring device or method required to be maintained or followed" is guilty of a Class C misdemeanor.[3]

In its prayer for relief, the State asked the court to enter a judgment in its favor and to assess civil penalties against Defendants in an amount not to exceed $25,000 per day for each day of the violation in accordance with Tenn. Code Ann. §§ 68-201-116 and -117.

In response, Defendants filed a second wave of Tenn. R. Civ. P. 12.02(6) motions to dismiss for failure to state a claim. Defendants argued that the State's claims were expressly preempted by Section 209(a) of the federal Clean Air Act because the claims related to "the control of emissions from new motor vehicles." *See* 42 U.S.C. § 7543(a). In the alternative, Defendants argued that the State's claims were impliedly preempted.

In its response to Defendants' motions, the State contended that its claims did not relate to the control of emissions from new motor vehicles. To the contrary, the State's claims concerned the more than 8,000 vehicles already in use and registered in Tennessee. Thus, the State was acting within the authority granted to the states by 42 U.S.C. § 7543(d) "to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles."

The trial court dismissed the State's pre-recall claims as expressly preempted by Section 209(a) of the federal Clean Air Act. However, the court denied Defendants' motion to dismiss the post-sale recall claims found in paragraphs 76 and 77 of the Amended Complaint, finding that "[t]here is conceivably a set of facts which would allow [the State] to regulate the use of the vehicles in Tennessee during and after the recall…." The trial court ruled:

---

[3] Under the Tennessee Act, tampering includes, but is not limited to, "[i]stalling any electrical device that is attached to the motor vehicle's computer system that is designed to give false on-board diagnostic readiness codes and is used as an attempt to pass the onboard diagnostic test," and "[i]nstalling high performance chips which reprogram or override the motor vehicle's on-board computer system." Tenn. Comp. R. & Regs. 1200-03-36-.02(17)(h), (l).

In summary, the Court is dismissing under Tenn. R. Civ. P. 12.02(6) [the State's] claims regarding tampering and [the emissions tests] before the recall because the activities or the conduct that the Defendants were involved in related back to the original design and manufacture of the motor vehicles. But after 2014 and 2015, which the Court understands from the [first amended complaint] were the years and the times when the recall went out for the Defendants' vehicles that are now owned by other people, [the State] is alleging that the Defendants in recalling and field fixing these vehicles violated state law, the anti-tampering and [the emissions tests] claims, because these do not relate back to the original manufacturing and insertion of the devices into the new cars. Therefore, the Court is not dismissing under Tenn. R. Civ. P. 12.02(6) the State's claims arising out of and after Defendants' recall and field fix of the vehicles in 2014 and 2015.

This Tenn. R. App. P. 9 interlocutory appeal followed in which the issue is whether any or all of the State's claims are preempted by the federal Clean Air Act.[4]

### STANDARD OF REVIEW

The purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss for failure to state a claim upon which relief can be granted "is to test the sufficiency of the complaint." *Gore v. Tenn. Dep't of Correction*, 132 S.W.3d 369, 373 (Tenn. Ct. App. 2003) (quoting *Willis v. Tenn. Dep't of Correction*, 113 S.W.3d 706, 710 (Tenn. 2003)). In determining whether the pleadings state a claim upon which relief can be granted, only the legal sufficiency of the complaint is tested, not the strength of the plaintiff's proof. *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). "Such a motion admits the truth of all relevant and material averments contained in the complaint, but asserts that such facts do not constitute a cause of action." *Id*. "In considering a motion to dismiss, courts should construe the complaint liberally in favor of the plaintiff, taking all allegations of fact as true and deny the motion unless it appears that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief." *Id*. In considering this appeal, we take all allegations of fact in the plaintiff's complaint as true and review the lower court's legal conclusions de novo with no presumption of correctness. Tenn. R. App. P. 13(d); *Stein*, 945 S.W.2d at 716; *Owens v. Truckstops of America*, 915 S.W.2d 420, 424 (Tenn. 1996); *Cook*, 878 S.W.2d at 938. Preemption is a question of law, which we review de novo. *Lake v. Memphis Landsmen, LLC*, 405 S.W.3d 47, 55 (Tenn. 2013).

---

[4] All parties filed notices of appeal; by order of this court, the State was designated as the appellant for the purposes of this appeal.

ANALYSIS

## I. FEDERAL PREEMPTION

The Supremacy Clause of the United States Constitution provides that the "Constitution, and the Laws of the United States…shall be the supreme Law of the Land…." U.S. Const. art. VI, cl. 2. Generally, the States govern "within their particular spheres concurrent with the federal government," subject to the power of Congress to preempt state law. *Pendleton v. Mills*, 73 S.W.3d 115, 126 (Tenn. Ct. App. 2001) (citing *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). Consistent with this principle, a federal law or regulation may preempt a state claim. *See Lake*, 405 S.W.3d at 56.

Courts recognize two types of preemption—express preemption, which occurs when Congress explicitly provides that federal law supersedes state law, and implied preemption, which falls into one of three categories: (1) field preemption, (2) direct conflict preemption, or (3) "purposes and objectives" conflict preemption. *Id*. Field preemption occurs when the federal government's legislation in a specific area is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 853 (Tenn. 2010) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Direct conflict preemption arises when it is impossible for an individual to comply with both state and federal law. *Id*. (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)). And, "purposes and objectives" conflict preemption results when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of a federal law." *Lake*, 405 S.W.3d at 56 (citations omitted).

Whether express or implied, two fundamental principles guide any preemption analysis. *Id*. First, congressional intent is "the ultimate touchstone." *Id*. (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). And, that intent "may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Riggs v. Burson*, 941 S.W.2d 44, 49 (Tenn. 1997) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)).

Second, any inquiry must begin "with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." *Id*. (quoting *Wyeth*, 555 U.S. at 565). This principle is particularly applicable here, because the federal Clean Air Act regulates health and safety, which is traditionally a power reserved for the states. *See Estrin v. Moss*, 430 S.W.2d 345, 348 (Tenn. 1968). Moreover, "[t]he pertinence of this presumption against federal preemption is clear enough from the terms of the [federal Clean Air Act] itself," which states that "'air pollution…and air pollution control at its source is the primary responsibility of States and local governments.'" *Engine Mfrs. Ass'n v. S. Coast Air*

*Quality Mgmt. Dist.*, 541 U.S. 246, 260 (2004) (Souter, J., dissenting) (quoting 42 U.S.C. § 7401(a)(3)).

This case solely concerns express and "purposes and objectives" conflict preemption. Defendants argue that the State's pre-recall claims are expressly preempted by Section 209(a). As to the post-sale recall claims, Defendants primarily argue that those claims are impliedly preempted because they conflict with the purposes and objectives of the federal Clean Air Act. Therefore, each set of claims will require a different analysis.

## II.   PRE-RECALL CLAIMS

The State contends the trial court erred in concluding that the pre-recall claims are preempted. As stated in the summary of its argument in the State's brief:

> The clear language of Section 209(a) of the [federal Clean Air Act] indicates that States are preempted only from adopting or attempting to enforce standards "relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a), not from regulating "registered, licensed" vehicles, 42 U.S.C. § 7543(d). This distinction is plainly made both in the legislative text and in the legislative history. The State's pre-recall claims involve only "registered, licensed" motor vehicles - not "new" motor vehicles. Tennessee's [emissions testing] program applies only to vehicles that are at least one year removed from initial registration in the State, and the State's tampering claims are limited to the same set of vehicles.
>
> In addition, the preemption in Section 209(a) of the [federal Clean Air Act] applies only to the enforcement of state-specific, not federal, emissions standards. The State is not seeking to enforce a state-specific emissions standard. Indeed, Tennessee does not have state-specific tailpipe-emissions standards for mobile sources. The State's [emissions] program tests registered, licensed vehicles for compliance with federal emissions standards, and the State is specifically authorized by Congress and the EPA to implement its [emissions testing] program. Defendants argue, and the trial court found, that the State's initial claims, the pre-recall claims are expressly preempted by Section 209(a) of the federal Clean Air Act. The State argues that Section 209(a) does not apply because the State's claims do not pertain to new motor vehicles.

Defendants argue that Section 209(a) expressly preempts states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles." *See* 42 U.S.C. § 7543(a). Defendants further contend in their brief that the State asserted claims based on Defendants' "installation during manufacturing of 'defeat device' software—prohibited by federal law—that caused their vehicles to meet

federal emissions standards during testing, but to emit excess nitrogen oxides ("NOx") when the vehicle was being driven on the road." Thus, and relying on the decision in *Wyoming v. Volkswagen Grp. (In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*), 264 F. Supp. 3d 1040 (N.D. Cal. 2017) [hereinafter *Wyoming*], Defendants insist the State's pre-recall claims are preempted. The trial court agreed, and so do we.[5]

The federal Clean Air Act was enacted in 1963 in response to "the growth in the amount and complexity of air pollution brought about by urbanization, industrial development, and the increasing use of motor vehicles," which posed a significant danger to the public health and welfare.[6] 42 U.S.C. § 7401(a)(2). While recognizing that air pollution control was "the primary responsibility of States and local governments," the act sought to create a system of cooperative federalism to address the problem. *Id.* § 7401(a)(3), (4). Thus, the federal Clean Air Act "made the States and the Federal Government partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The nature of that partnership is what is at issue in this case.

To promote efficient and fruitful cooperation between the states and the federal government, the federal Clean Air Act assigned different tasks to each in its

---

[5] Defendants also insist the State of Tennessee has been adequately compensated for the violations at issue because, as stated in their brief:

> As Congress intended, the EPA has comprehensively addressed Defendants' conduct pursuant to its broad authority under the CAA, including through $4.3 billion in civil and criminal penalties and substantial injunctive relief that the EPA determined will "fully mitigate" any environmental harm caused by Defendants' conduct. As part of that nationwide enforcement, the EPA required Defendants to pay more than $46 million to the State of Tennessee to address the environmental impact of excess NOx in Tennessee specifically. Further, as required by the EPA and other federal settlements, Defendants have offered "tangible, substantial benefits" to all eligible owners and lessees of the affected vehicles—including Tennessee residents—that are "the equivalent of—or superior to—those obtainable after successful litigation," including the option either to sell back their vehicles to Defendants or to obtain a free emissions modification to bring the cars into compliance with federal emissions standards, plus substantial additional cash restitution. *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 617 (9th Cir. 2018). For Tennessee residents alone, this relief exceeded $280 million. In total, Tennessee and its residents (including dealers) have already received roughly $30,000 per affected vehicle.

[6] Congress noted that a study conducted of Nashville, Tennessee, revealed that sections of the city "subject to heaviest air pollution were the areas of highest death rates from all respiratory diseases and from such specific diseases as tuberculosis, influenza, and pneumonia." H.R.Rep. 90-728 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 1938, 1942.

implementation. *See Gen. Motors Corp.*, 496 U.S. at 532-33. First, the EPA[7] was to promulgate national ambient air quality standards ("NAAQS"), and then each state had to submit a state implementation program ("SIP") "to implement, maintain, and enforce the NAAQS." *Id*. at 533 (citing 42 U.S.C. §§ 7409(a)(1), 7410(a)(1)). As each state submitted its SIP, the EPA was tasked with reviewing the SIP and approving it upon a determination "that it was adopted after reasonable notice and hearing and that it met various substantive requirements." *Id.* (citing 42 U.S.C. § 7410(a)(2)).

The Tennessee Act, Tenn. Code Ann. §§ 68-201-101 to -121, is Tennessee's SIP. The Tennessee Act implements, maintains, and enforces the NAAQS, as to mobile sources of pollution, through emissions testing programs and anti-tampering laws. *See* Tenn. Code Ann. § 68-201-105(a)(1)(A). Tennessee's emissions testing program provides for emissions testing in specified counties in the State as a requirement for automobile registration. Tenn. Comp. R. & Regs. 1200-03-29-.03. Tennessee's anti-tampering laws, generally, seek to prevent persons from tampering with the emissions control systems of automobiles in a way that would render those systems less effective. *E.g*., Tenn. Code Ann. § 68-201-120.

In addition to emissions testing programs and anti-tampering laws, Congress intended that the NAAQS, when realistically applied would "require that urban areas do something about their transportation systems, the movement of used cars, the development of public transit systems, and the modification and change of housing patterns, employment patterns, and transportation patterns generally." 116 Cong. Rec. 42,387 (1970) (Sen. Muskie). To facilitate the achievement of the foregoing objectives, the federal Clean Air Act grants to state and local governments the right "to control, regulate, or restrict the use, operation, or movement *of registered or licensed motor vehicles*." 42 U.S.C. § 7543(d) (emphasis added).

The NAAQS apply to both stationary and mobile sources of pollution. *See Engine Mfrs. Ass'n v. E.P.A.*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). While the federal Clean Air Act gives to the States primary control over stationary sources of pollution, "regulation of motor vehicle emissions [has] been a principally federal project." *Id.* "The regulatory difference is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Id*. Additionally, during the hearings leading up to the 1967 amendments, automobile manufacturers expressed concern that adhering to 51 different emissions standards would place a severe economic strain on the industry:

---

[7] The Environmental Protection Agency was not created until December 2, 1970, which coincided with the 1970 amendments to the federal Clean Air Act, discussed *infra*. United States Environmental Protection Agency. *Evolution of the Clean Air Act*. EPA, http://www.epa.gov/clean-air-act-overview/evolution-clean-air-act, (last updated Jan. 3, 2017).

[t]he process of fixing and administering emission standards for new cars is at best a complex one. Judgments must be made, often on the basis of incomplete scientific evidence, on the question of which pollutants endanger health and welfare and at what levels it is technologically and economically feasible to fix emissions rates.

In a program of this kind many questions arise. What are the requirements for testing new vehicles as they are produced each year? Precisely how are the tests to be performed and under what conditions? What are the rules for interpreting the scientific data developed in the testing process?

H.R. Rep. No. 90-728 (1967) (quoting *Air Quality Act of 1967: Hearing on H.R. 728 before the H. Comm. On Interstate and Foreign Commerce*, 90th Cong. 482–83 (1967) (statement of Thomas C. Mann, president of the Automobile Manufacturers Association)), *as reprinted in* 1967 U.S.C.C.A.N. 1938, 1957.

Legislators opined that

the problems faced by the automobile manufacturing industry arising out of identical Federal and State standards, separately administered, would be difficult for the industry to meet since different administration could easily lead to different answers to identical questions. Similarly, the problems arising out of different standards applicable nationwide…even though identically administered, would also led to difficulties.

*Id*. While manufacturers could resolve the problem of multiple standards "by building vehicles that meet whichever standard is the more stringent, this would lead to increased costs to consumers nationwide, with benefit only to those in one section of the country." *Id*. at 1958.

Though concerned with minimizing costs to consumers, Congress was also interested in promoting "one of federalism's chief virtues"—the "role of States as laboratories."[8] Therefore, recognizing that California was a leader and innovator in the

---

[8] Justice O'Connor wrote, "One of federalism's chief virtues, of course, is that it promotes innovation by allowing for the possibility that 'a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.'" *Gonzales v. Raich*, 545 U.S. 1, 42 (2005) (Connor, J., dissenting) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). In debates surrounding the federal Clean Air Act's emissions standards, Senator Murphy of California "convinced his colleagues that the entire country would benefit from his state's continuing its pioneering efforts, California serving as 'a kind of laboratory for innovation.'" *Engine Mfrs. Ass'n*, 88 F.3d at 1080 (citations omitted).

fight against mobile sources of pollution, the federal Clean Air Act permitted California to set its own emissions standards, separate from the federal standards. *Engine Mfrs. Ass'n*, 88 F.3d at 1079–80. As a consequence, rather than allow 51 different emissions standards, as manufacturers feared, the federal Clean Air Act dictated that "motor vehicles must be either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Id*. at 1080.

As an additional compromise to the automobile industry, and central to the case *sub judice*, Congress enacted Section 209(a), *Engine Mfrs. Ass'n*, 88 F.3d at 1080, which provides:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No state shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). "New motor vehicle" is defined as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser." *Id.* § 7550(3). "Ultimate purchaser" means "with respect to any new motor vehicle or new motor vehicle engine, the first person who in good faith purchases such new motor vehicle or new engine for purposes other than resale." *Id.* § 7550(5).

As to the regulation of emissions, Section 206(a) of the federal Clean Air Act gives the federal government exclusive control over the new vehicle manufacturing process. First, the EPA issues "certificates of conformity" to new motor vehicle prototypes that meet federal emissions standards. *Id*. § 7525(a). After the vehicles are manufactured, the EPA then determines whether those vehicles remain in compliance by testing sample vehicles. *Id*. § 7525(b)(1). If the EPA discovers that some or all of the vehicles fail to conform to emissions standards, the EPA will suspend the certificates of conformity for the non-compliant vehicles until the manufacturer corrects the deficiency. *Id*. § 7525(b)(2)(A)(i)–(ii).

Having identified the congressional purpose of the federal Clean Air Act and Section 209(a), in particular, we turn to the State's arguments for why its pre-recall claims are not preemptively barred.

For one, the State contends that Section 209(a) does not apply because the State is not seeking to enforce a state-specific emissions standard; in fact, it insists Tennessee does not have a state standard for automobile emissions. We find this contention misplaced because Section 209(a) provides in pertinent part: "No State…shall…attempt

- 12 -

to enforce **any** standard relating to the control of emissions from new motor vehicles or new motor vehicle engines[.]" *Id.* § 7543(a) (emphasis added). Here, the State is attempting to enforce the federal standard, which Section 209(a) clearly states it may not do.[9]

The State's second contention is that even if Section 209(a) prohibits state enforcement of federal standards, the State is not enforcing a "standard" because it is not "impos[ing] quantitative levels of emissions." Again, we respectfully disagree. The United States Supreme Court held that "standard" in the context of Section 209(a) not only means that "the vehicle or engine must not emit more than a certain amount of a given pollutant," but also means that the vehicle "must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions." *S. Coast Air Quality*, 541 U.S. at 253. Here, the State is seeking to punish Defendants for installing software in the subject vehicles that tampered with the vehicles' emissions control systems and caused the OBD to falsely report that the vehicles' emissions control systems were working properly. Both allegations concern "design feature[s] related to the control of emissions." *See id.* Therefore, the State's claims concern a standard.

The foregoing notwithstanding, the State contends that too broad an interpretation of Section 209(a), and particularly the meaning of "relating to" in Section 209(a), would frustrate the states' efforts in reducing air pollution and argues that Section 209(a) only applies when states directly interfere with the new vehicle manufacturing process as outlined in Section 206(a), 42 U.S.C. § 7525. Defendants counter by advocating a broad interpretation of "relating to" in order to prevent the states from interfering directly or indirectly with the manufacture of new vehicles.

While the Supreme Court has not defined "relating to" in the context of Section 209(a), it has defined those words in other preemption cases. In a preemption case involving the Federal Aviation Act, for example, the Court stated that "[t]he ordinary meaning of these words is a broad one —'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with'…— and the words thus express a broad preemptive purpose." *Morales v. Trans World Airlines*, 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990) (considering the

---

[9] The legislative history reveals that Congress wanted to avoid the problems that would result if automobile manufacturers had to answer to a number of different regulators enforcing the same standard. H.R. Rep. No. 90-728 (1967), *as reprinted in* 1967 U.S.C.C.A.N. 1938, 1957. ("[T]he problems faced by the automobile manufacturing industry arising out of identical Federal and State standards, separately administered, would be difficult for the industry to meet since different administration could easily lead to different answers to identical questions.")

Employment Retirement Income Security Act and holding that "relates to" means "[having] a connection with" or "[in] reference to.")

Considering the plain meaning of "relating to," we agree with Defendants that Congress intended to prevent states from directly or indirectly regulating emissions in new motor vehicles. Moreover, this court need not split hairs regarding the precise meaning of "relating to" because the State's claims would be preempted by Section 209(a) even if we were to give the term a narrow reading. This is so because the State's pre-recall claims not only reference Defendants' actions during the manufacturing process, they are, in fact, **premised on** those actions. *See Wyoming*, 264 F. Supp. 3d at 1057.

Because the pre-recall tampering claims are premised on Defendants' acts of installing a defeat device in a new motor vehicle, prior to registration, in violation of Section 209(a), they are expressly preempted. *See id.* at 1052, 1054 (citing 42 U.S.C. § 7543(a)). Accordingly, we affirm the decision of the trial court to dismiss the pre-recall claims.

### III.    POST-SALE RECALL CLAIMS

Defendants contend the trial court erred by denying their motion to dismiss the post-sale recall claims. Defendants rely principally on a federal decision that was filed after the trial court rendered its decision in this matter, that being *Salt Lake County v. Volkswagen* (*In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*), 310 F. Supp. 3d 1030 (N.D. Cal 2018) [hereinafter *Counties*],[10] which is the only federal ruling on post-sale recall claims, also referred to as "Update Tampering" claims. Defendants also rely on a legal principle that the State does not dispute, that the decisions of lower federal courts have persuasive force in Tennessee. *See Howell v. Metro. Sexuality Oriented Bus. Licensing Bd.*, 466 S.W.3d 88, 108 (Tenn. Ct. App. 2014); *see also Tennessee Clutch & Supply, Inc. v. Auto-Owners (Mut.) Ins. Co.*, 556 S.W.3d 203, 209 (Tenn. Ct. App. 2017).

The State counters, arguing that Defendants' reliance on *Counties* is misplaced because the claims at issue in *Counties* are distinguishable from the claims at issue here.

---

[10] This case is cited in the briefs as *Counties*, because in addition to states, two counties—Hillsborough County, Florida, and Salt Lake County, Utah—filed tampering claims against Volkswagen that are similar to *Wyoming's*, except in *Counties* the plaintiffs also alleged that Volkswagen modified its defeat device to operate more effectively, and perhaps even added new defeat devices, through software updates during vehicle maintenance and post-sale recalls. *See Counties*, 310 F. Supp. 3d at 1032. The central question in *Counties* was whether the new allegations—post-sale modifications of software in vehicles by automobile manufacturers—saved the tampering claims from preemption. *Id*. An appeal is pending in the United States Court of Appeals, Ninth Circuit.

The State also contends that *Counties* lends support to the State's position in two ways: (1) the court in *Counties* found that post-recall claims related to the defeat devices are not expressly preempted under Section 209(a) of the federal Clean Air Act; and (2) the *Counties* court found that the "relate-back" principle does not apply when plaintiffs are not seeking to change any aspects of the manufacturing conduct. Furthermore, the State insists that although *Counties* ruled that the post-sale recall claims were impliedly preempted, implied preemption does not apply here because: (1) the State seeks no relief that would interfere with the manufacturing process; (2) Congress specifically authorized (and the EPA approved) Tennessee's emissions testing program; (3) the State is obligated to enforce its anti-tampering regulations and protect the integrity of its emissions testing program as part of SIP compliance; and (4) the potential of state penalties in addition to federal penalties does not constitute a basis for preemption, particularly when the state seeks to punish different misconduct.

The post-sale recall claims at issue here are stated in paragraphs 76 and 77 of the amended complaint. Briefly summarized, the State alleges that in 2014 and 2015, Defendants recalled the non-compliant vehicles, purportedly to improve the vehicles' performance level; however, in reality, Defendants used the recalls to improve the defeat device software. Thus, the State contends that Defendants violated Tennessee's anti-tampering laws by tampering with the automobiles' emissions control systems after sale to bona fide purchasers and while the vehicles were licensed, registered, and in use in Tennessee.

Without the benefit of the reasoning and decision in *Counties*, the trial court ruled that the post-sale recall claims were not expressly preempted by Section 209(a). While we agree that these claims are not expressly preempted, we have concluded that the recall claims are impliedly preempted because they conflict with the purposes and objectives of the federal Clean Air Act.

As Defendants' correctly state in their brief, "Congress gave the EPA exclusive and comprehensive authority to regulate nationwide, model-wide conduct by vehicle manufacturers and distributors." Therefore, by seeking to regulate tampering conduct that occurred on a nationwide, model-wide basis, the State is interfering in an area that is under the exclusive control of the federal government.

A "purposes and objectives" conflict preemption analysis of the post-sale recall claims requires this court to delve again into the legislative history, language, and structure of the act to determine the federal Clean Air Act's purposes and objectives, particularly as they pertain to the regulation of emissions in used motor vehicles. Additionally, because a presumption against preemption applies, the purposes and objectives of the act, and the conflict, if any, must be clear and unambiguous for the State's claims to be preempted. *Morgan Keegan & Co., Inc. v. Smythe,* 401 S.W.3d 595, 605 (Tenn. 2013) (citations omitted).

## A. Legislative History, Structure, and Language of the Clean Air Act

Significantly, Section 209(d) of the federal Clean Air Act, upon which the State relies, does not grant to the states the authority to regulate in-use motor vehicles "carte blanche." *Counties*, 310 F. Supp. 3d at 1046. Section 209(d) states, "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right ***otherwise*** to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d) (emphasis added). The use of "otherwise" indicates that "state…regulation of in-use vehicles is subject to the limitations imposed by federal law." *Counties*, 310 F. Supp. 3d at 1046. Therefore, we must determine to what extent the federal Clean Air Act limits state emissions regulation of used motor vehicles. Because the 1970 amendments to the federal Clean Air Act primarily concern the control of emissions in used vehicles, those amendments and the legislative history surrounding them are instructive. [11]

In 1970, Congress discovered that the 1968 production-line cars met federal emissions standards, on average; however by the winter of 1969, those same cars no longer complied. *See* 116 Cong. Rec. 32,915 (1970) (quoting the Council on Environmental Quality). Congress opined, "Standards for new cars will have little impact if we cannot assure compliance with those standards over the useful life of those vehicles." *Id*. at 42,385 (quoting the Summary of the Provisions of Conference Agreement on the Clean Air Amendments of 1970). Therefore, Congress intended to "impose upon the manufacturer a responsibility and an obligation to build into these cars a durability quality that will permit the cars to meet the performance standards required." *Id*. at 33,093 (Sen. Muskie). To that end, the 1970 amendments employed a more comprehensive testing regime that would specifically address the problem presented by in-use motor vehicles.

Subsequent amendments required manufacturers to equip each new vehicle with a durable emissions control system that would cause the vehicle to meet the federal emissions standard for a five-year period or 50,000 miles after sale. *See* Clean Air Act, Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990) (codified as amended at 42 U.S.C. § 7541(c)(4)(C)). The manufacturer also had to issue a warranty to that effect to future owners. *See* Act of December 31, 1970, Pub. L. 91-604, 84 Stat. 1676, 1696 (codified as amended at 42 U.S.C. § 7541(a)(1)). If the owner maintained and operated the vehicle as the manufacturer instructed and the vehicle did not comply with federal emissions standards within the requisite time period, the manufacturer had to remedy the nonconformity at the manufacturer's expense. *Id*. at 1697 (codified as amended at 42 U.S.C. § 7541(b)).

---

[11] We also occasionally reference the legislative history surrounding the 1977 amendments.

Throughout the debates surrounding the 1967, 1970, and 1977 amendments Congress consistently recognized that "as a national industry, automobiles required national emission regulation." 122 Cong. Rec. 23,859 (1976); *see* H.R. Rep. No. 90-728. To that end, the federal Clean Air Act placed the primary responsibility for emission control in motor vehicles "where it really should be, and that is with the manufacturer and the EPA." 123 Cong. Rec. 18,502 (1977) (Sen. Hatch);[12] *see Engine Mfrs.*, 88 F.3d at 1079 ("[R]egulation of motor vehicle emissions [has] been a principally federal project.")

The reason for this is simple. Unlike stationary sources of pollution, motor vehicles can and do move across state lines. As vehicles move from state to state, they encounter different topographies and climates, both of which are factors that affect the vehicles' emissions. 116 Cong. Rec. 33,095 (1970) (Sen. Allott). Thus, legislators recognized that emissions control in used automobiles, like new automobiles, needed federal oversight.

Colorado Senator Gordon Allott explained:

[I]f I am delivered a car in Washington, D.C., which contains the so-called proper emission controls, and it is in working condition…and I drive that car to Denver, Colo., that car will no longer meet those qualifications which held in Washington, D.C.

On the other hand, when I reach Denver, if I am fortunate enough to find a garage in which I can get the emission controls on the car corrected…I still have a problem when I leave and drive to, say, Vail or Dillon, and I cross two mountain passes, one of which is few thousand feet, under 12,000 feet, and the other is in excess of 11,000 feet, the car will not meet the emission standards there.

*Id*.

To provide the necessary federal oversight for used motor vehicles, Congress enacted Section 207(b) of the federal Clean Air Act, which mandates nationwide, in-use motor vehicle emissions testing. 42 U.S.C. § 7541(b). And, subsequent to the enactment of Section 207(b), the EPA implemented 40 C.F.R. § 86.1845-04, which outlines the specific testing requirements for used vehicles. Under the implementing EPA regulation, manufacturers must test emissions in a specified number of in-use motor vehicles at and over 10,000 miles. *See* 40 C.F.R. § 86.1845-04(b)–(c). These tests take "geographical

---

[12] Senator Hatch's comments were made in the context of a debate surrounding a proposal that states be permitted to test automobiles prior to sale.

limitations" into account, like climate and altitude, by requiring manufacturers to test sample vehicles from different areas in the country. *See id*. § 86.1845-04(d)(3)(i)–(iii). If the EPA "determine[s] that a substantial number of *any class or category of vehicles or engines*, although properly maintained and used, do not conform to [federal standards]," the EPA must inform the manufacturer. 42 U.S.C. § 7541(c)(1) (emphasis added). Thereafter, the manufacturer is required to provide the EPA with a plan for correcting the problem, which usually includes a recall and/or repair of the non-compliant vehicles. *Id*. Thus, the federal Clean Air Act grants to the federal government exclusive control over model-wide design issues in *used* motor vehicles.

When one considers the complexity of automobile engineering, having the manufacturer answer to a single regulator when the nonconformity concerns the design of the vehicle, whether new or used, makes the emissions control process more efficient and less costly. *See* H.R. Rep. No. 90-728 (1967) *as reprinted in* 1967 U.S.C.C.A.N. at 1956–57. As Congress stated in 1967, "The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance...." *Id*. at 1957. Moreover, as the district court explained in *Counties*,

> EPA, as a federal agency, is best positioned to enforce emission standards on a model-wide basis because model-wide emission problems will almost invariably affect vehicles in states and counties throughout the country. Further, when investigating model-wide emission issues, EPA can also rely on testing data it acquired from manufacturers during the new vehicle certification process, which it can utilize to understand how vehicle models are performing in use as compared to how they were performing during assembly-line testing. Likewise, because the new vehicle certification process requires EPA to work directly with vehicle manufacturers, the agency has preexisting relationships that it can rely on when addressing model-wide emission defects in used vehicles.

310 F. Supp. 3d at 1043.

Nevertheless, Congress intended that the states would play a role when on-the-road performance issues were related to the *individual owner's* failure to maintain the vehicle. Congress summarized the 1970 amendments, stating:

> [B]y requiring the manufacturer to warranty performance, margins of safety will be built into each vehicle to [e]nsure better than required performance, systems will be designed to minimize deterioration, *State vehicle emission inspection programs can cause proper maintenance to be observed by the motorists* and the air quality objectives of this legislation will be implemented.

116 Cong. Rec. 42,385 (1970). Accordingly, 42 U.S.C. § 7541(h)(2) provides that states are permitted to test "a motor vehicle after the date of sale of such vehicle to the ultimate purchaser (*except that no new motor vehicle manufacturer or dealer may be required to conduct testing under this paragraph*)." (Emphasis added). Significantly, nowhere in the federal Clean Air Act are the states given authority to regulate an automobile manufacturer's compliance with emissions standards on a nationwide, model-wide basis, whether the vehicle is new or used. *See Counties*, 310 F. Supp. 3d at 1043.

Thus, when considered in light of Congress's express concern with preventing obstruction to interstate commerce, *see* 1967 U.S.C.C.A.N. at 1956, state regulations "directed primarily to intrastate activities" where "the burden of compliance [is] on individual owners" would "cause only minimal interference with interstate commerce." *Allway Taxi, Inc. v. City of New York*, 340 F. Supp. 1120, 1124 (S.D.N.Y.) *aff'd*, 468 F.2d 624 (2d Cir. 1972). Similarly, if the state regulated manufacturer activities conducted solely within that state's borders, such regulation would likely not obstruct interstate commerce. *See Counties*, 310 F. Supp.3d at 1043.[13] However, a state's assertion of control over a manufacturer's nationwide activities has nationwide economic consequences. *See Allway Taxi*, 340 F. Supp. at 1124.

Here, the State is attempting to impose fines and penalties upon Defendants for tampering conduct that took place during a national recall. Though, technically, the State's tampering claims only concern individual cars within the State, these claims are most certainly part of widespread tampering conduct that occurred in specific vehicle models in a number of states. Thus, the State's claims could have nationwide economic consequences. This is especially apparent when we consider the agreement Defendants struck with the federal government concerning Defendants' tampering conduct during both the manufacturing process and the 2014/15 recall. As part of that agreement, Defendants were required to repair non-compliant vehicles throughout the United States. *United States v. Volkswagen AG* (*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*), No. 2672 CRB (JSC), 2016 WL 6442227, at *4 (N.D. Cal. Oct. 25, 2016). However, the repair of the emissions control system *would not* make the vehicles compliant with the federal standard. The federal district court that approved the partial consent decree explained:

> Despite the fact that a proposed Fix must undergo stringent test procedures and receive EPA and CARB approval, the Fix still represents a compromise. The United States recognizes there are "engineering

---

[13] The court stated, "If, for example, a manufacturer were to tamper with a single in-use vehicle during vehicle maintenance, the [federal] Clean Air Act would not bar a state or local government from bringing a tampering claim against the manufacturer if the tampering occurred within its borders."

limitations faced by all parties—that a fully-compliant 'fix' that brings these vehicles to their certified standard and has no detrimental impacts on the vehicle performance is not achievable within a realistic timeframe." For that reason, Appendix B *does not require any Fix to bring the subject vehicles to the same standard to which they originally certified*.

*Id.* at *5 (emphasis added).

Should this court allow the State's claims to proceed, the State could assert "that vehicles with EPA-approved modifications continue to violate [State] tampering rules because the modifications do not bring the vehicles into compliance with the originally certified emissions standards." *See Counties*, 310 F. Supp. 3d at 1046 n.7. Defendants would continue to owe penalties unless and until they further altered the vehicles to the State's satisfaction. It would be no different than if the State were to insert itself into the model-wide, in-use testing and recall process outlined in Section 207 of the federal Clean Air Act, 42 U.S.C. § 7541, which is exclusively under federal control. And, if other states were to do the same, "the chaotic situation which Congress sought to avoid would become an overnight reality." *See Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 576 (S.D.N.Y. 2011), *aff'd sub nom. Butnick v. Gen. Motors Corp.*, 472 F. App'x 80 (2d Cir. 2012) (quoting *In re Office of Att'y Gen. of New York*, 269 A.D.2d 1, 11 (1st Dep't 2000)).

As a part of the plea agreement and consent decrees with the EPA, Defendants were required to pay $4.3 billion in civil and criminal penalties, invest $2 billion in Zero Emission Vehicle technology, recall and repair the non-compliant vehicles, and contribute $2.925 billion to an emissions mitigation trust, of which the states, including Tennessee, were the beneficiaries. *Counties*, 310 F. Supp. 3d at 1033. The State concedes that this monetary award obtained by the federal government will fully mitigate the environmental harm caused in Tennessee. However, the State argues that "the potential of state penalties in addition to federal penalties does not constitute a basis for preemption." On that point, we agree.

This court takes seriously Congress's intent to make the states and the federal government "partners in the struggle against air pollution." *Gen. Motors Corp.*, 496 U.S. at 532. Bringing a state action against Defendants will, no doubt, have a strong deterrent effect and further the federal Clean Air Act's purposes and objectives by reducing air pollution.[14] Nevertheless, while Congress enacted the federal Clean Air Act to curb air

---

[14]Minnesota also filed state claims against Defendants for tampering conduct that occurred during the national recall. *State by Swanson v. Volkswagen Aktiengesellschaft*, No. A18-0544, 2018 WL 6273103, at *2 (Minn. Ct. App. Dec. 3, 2018). Persuaded by the *Counties* decision, the Minnesota Court of Appeals determined that the State's claims were impliedly preempted. *Id.* at *9. However, Judge Tracy

(continued…)

pollution and its deleterious effects, it is clear from the federal Clean Air Act's legislative history, structure, and plain language that Congress intended to do so in an efficient and cost-effective manner to protect interstate commerce. Consequently, "as a national industry," automobile manufacturers require "national emission regulation." 122 Cong. Rec. 23,859 (1976). Because the State's post-sale recall claims conflict with this objective, they are preempted.

Accordingly, the State's cause of action is preempted by the federal Clean Air Act.

## IN CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded with instructions to dismiss all claims. Costs of appeal are assessed against the State of Tennessee.

_____
FRANK G. CLEMENT JR., P.J., M.S.

---

Smith dissented, contending that the State's claims were harmonious with Congress's purpose in enacting the federal Clean Air Act, which was "to promote the states' exercise of their authority in the fight against air pollution." *Id.* at \*10–11. We agree with the majority.